In the Matters of DRW PROPERTY CO. 82 d/b/a Apache Arms (the Single Original Hereof Shall Be Deemed Filed Under Each Partnership Debtor and In Each Case Listed In the Caption of the Order Procedurally Consolidating Cases For Certain Administrative Purposes Entered on March 29, 1985) Treehouse of Orlando, Ltd., d/b/a Treehouse.

Bankruptcy Nos. 485–40510, 485–40588.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Feb. 21, 1986.

See also, 54 B.R. 489.

Robert E. Phelan, Katherine C. Malory, Hanes & Boone, Dallas, Tex., for debtor, DRW Property Company 82 d/b/a Apache Arms.

Stephen A. McCartin, Susan A. Rankin, Gardere & Wynne, Dallas, Tex., for Donald R. Walker.

Philip Pierce, Booth, Marcus & Pierce, New York City, for Unsecured Creditors Committee.

Richard W. Ward, Palmer, Palmer & Coffee, P.C., Dallas, Tex., for Creditor, Treehouse Associates Ltd. Partnership.

MEMORANDUM OPINION AND ORDER REGARDING APPLICABILITY OF 11 U.S.C. § 1111(b)(1)(A) TO UN-DERSECURED, NON–RECOURSE DEFICIENCY CLAIMS

MICHAEL A. McCONNELL, Bankruptcy Judge.

Between March 25, 1985 and May 31, 1985, ninety-five related general and limited partnerships ("the Project Partnerships" or "Debtors") filed voluntary petitions in this Court seeking protection under Chapter 11 of the Bankruptcy Code. Each partnership owned either an apartment complex or office building as its sole asset. Donald R. Walker ("Walker"), a Dallas real estate developer and syndicator, was a general partner in each of the Project Partnerships. In addition, each of the Project Partnerships had at least one corporate general partner, consisting of a corporation whose stock is wholly-owned by Walker. The various Debtors have maintained management and control of their assets pursuant to 11 U.S.C. § 1107 and an Order has been entered "procedurally consolidating" the Project Partnerships for administrative convenience in accordance with Bankruptcy Rule 1015(b).

At the commencement of the bankruptcy proceedings, the Project Partnerships owned approximately eighty-three apartment complexes and office buildings located throughout seven states. These assets secured, in the aggregate, approximately $255 million in indebtedness to approximately three hundred secured creditors. Approximately 5,500 limited partners/investors have also invested, in the aggregate, approximately $165 million in the Project Partnerships.

Upon the filing of the bankruptcy petitions, the Project Partnerships ceased making monthly debt service payments to the secured lenders due to severe cash flow problems. The secured lenders immediately began filing applications with this Court to prevent the Project Partnerships from utilizing "cash collateral" of the lenders in the form of rental receipts in the operations of the properties, and, in addition, requested the Court to modify the automatic stay provisions of the Bankruptcy Code to allow the secured lenders to accelerate their indebtedness and foreclose their liens on the properties.

Although this Court, in most instances, refused to lift the automatic stay (provided the Debtors made periodic cash payments as adequate protection), many of the Debtors were unable to comply with the terms of the adequate protection orders; and, therefore, approximately forty-seven of the

Project Partnerships have had their sole asset foreclosed upon or abandoned to the relevant secured creditors during these proceedings.

Many of the secured creditors were unable to receive full payment of their indebtedness at their foreclosure sales, so they now assert "deficiency claims" for the shortfall. However, many of these same secured creditors holding deficiency claims lent money to the Debtors on a non-recourse basis; hence, under the terms of their mortgage documents and applicable state law, they would not be able to assert deficiency claims against the Debtors.[1]

The Project Partnerships and the "Walker Entities" have now filed proposed Joint Disclosure Statements and Plans of Reorganization.[2] In general, the Debtors plan to consolidate the Project Partnerships and certain non-Debtor partnerships into a single Texas limited partnership, remove and replace Walker and his corporations as general partners, eliminate certain properties not believed to be economically viable and pay unsecured creditors in full through deferred cash payments over a five year period. The Debtors seek to fund the Plan through cash contributions from investors in an aggregate amount of approximately $25 million.

The Debtors, however, do not propose to include the sizeable deficiency claims of non-recourse lenders in the class of unsecured creditors. It is the Debtor Partnerships' position that these undersecured non-recourse creditors are precluded from asserting deficiency claims against the estate by the terms of their loan documents and may only look to the proceeds of the foreclosure sales of their collateral for repayment of their loans.

An objection to the proposed Disclosure Statement has been filed by Treehouse Associates Limited Partnership, a non-recourse undersecured creditor, claiming

that, contrary to the assertions of the Debtors, § 1111(b) of the Bankruptcy Code operates to transform these non-recourse claims into recourse claims against the Debtors-in-Possession. Accordingly, Treehouse Associates asserts that the Court should hold that non-recourse undersecured creditors may make "deficiency" claims to be treated in the class of unsecured creditors and that this alleged right should be disclosed in the Joint Disclosure Statement.

The objection to the proposed Disclosure Statement was considered by the Court at the Disclosure Statement hearing held on January 15, 1986 pursuant to Rule 3017 of the Bankruptcy Rules; and, at the conclusion of the hearing, the Court requested post-hearing briefs. All post-hearing briefs have now been submitted and this Memorandum Opinion constitutes the Court's findings of fact and conclusions of law on this "contested matter" pursuant to Rules 9014 and 7052 of the Bankruptcy Rules.

## ISSUE PRESENTED

The sole issue presented to the Court for determination concerns whether Section 1111(b)(1)(A) of the Code allows an *undersecured nonrecourse creditor* to retain and assert an unsecured claim ("deficiency claim") in a Chapter 11 bankruptcy proceeding even if the collateral is abandoned or foreclosed upon during the pendency of the Chapter 11 proceeding.

## LEGAL ANALYSIS

Section 1111(b) of the Bankruptcy Code was enacted by Congress in an attempt to cure the harsh result of the holding in *Great National Life Insurance Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr.N.D.Ga.1976) decided under Chapter XII of the former Bankruptcy Act. Pine Gate Associates, Ltd. was a limited partnership whose sole asset was an apart-

---

1. In "nonrecourse" real estate lending, creditors look solely to real property mortgaged as collateral for repayment in the event of default by the maker of a promissory note. The lender waives the right to seek payment from the maker of the note under normal personal or corporate liability.

2. "Walker Entities" as defined in the Disclosure Statement means Donald R. Walker, individually, DRW Investments Inc., DRW Realty Services Inc., Perry Settlement Corp., Summit Investment Company and Dallas Grand Prix of Texas Inc.

ment project financed on a non-recourse basis. The partnership filed for relief under Chapter XII of the Bankruptcy Act and proposed a Plan of Arrangement which limited the secured claim of the lenders to the appraised value of the property, which was less than the outstanding indebtedness. There were no provisions in the plan for allowing the lenders an unsecured deficiency claim and, accordingly, the lenders were not entitled to vote or participate in the unsecured claims class. The lenders argued at the confirmation hearing that their negotiated "benefit of the bargain" in non-recourse financing was either full payment or the right to foreclose on the property and that their interest would not be adequately protected unless they were paid in full or allowed to foreclose. The bankruptcy court held, however, that the proposed treatment of the secured claim through a cash payment equal to the appraised value of the collateral was sufficient and approved the plan over the secured lenders objection (i.e. "cramdown" of the lenders secured class).

As a result of the *Pine Gate* decision, it became clear that (under the former Bankruptcy Act) a debtor could file bankruptcy proceedings during a period when real property values were depressed, propose to repay secured indebtedness only to the extent of the then appraised value of the property, "cramdown" the secured lender class and thereby preserve all potential future appreciation for the debtor. The undersecured non-recourse lender would not be entitled to vote in the unsecured class thereby making confirmation of the plan much easier. *In Re South Village, Inc.*, 25 B.R. 987 (Bankr.D.Utah 1982); Stein, *Section 1111(b): Providing the Undersecured Creditors with Post-Confirmation Appreciation in the Value of the Collateral*, 56 AM.BANKR.L.J. 195 (1982).

By only repaying the undersecured, non-recourse creditor the appraised value of the property rather than returning the property to the lender or allowing him to foreclose, the Debtor received all future appreciation and the lender did not receive full payment of his debt or possession of the property (i.e. the benefit of its bargain).

Secured creditors were shocked by the result in *Pine Gate* and sought relief from Congress when the Bankruptcy Code was proposed and debated. Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Perogative*, 39 BUS. LAWYER 441 (1984). In the final version of the Bankruptcy Code, Congress included Section 1111(b) to alleviate the *Pine Gate* problem and to attempt to restore the benefit of the bargain to the non-recourse secured creditor. Klee, *"All you Ever Wanted to Know About Cram Down Under the New Bankruptcy Code"*, 53 AM.BANKR. L.J. 133 (1979); Kaplan, *"Nonrecourse Undersecured Creditors Under New Chapter 11—The Section 1111(b) Election: Already a Need for Change"*, 53 AM. BANKR.L.J. 269 (1979). Section 1111(b) provides as follows:

"(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title [11 U.S.C. § 502] the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless:

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) *such holder does not have such recourse and such property is sold under section 363 of this title [11 U.S.C. § 363] or is to be sold under the plan.* 11 U.S.C. § 1111(b)(1)(A)(i) (ii).

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under Section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding Section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed." (emphasis added)

Section 1111(b) of the Bankruptcy Code establishes the general rule that a claim in a Chapter 11 case secured by a lien on property of the estate is to be "allowed" as if the claimant had recourse against the Debtor, whether or not by contract or under applicable state law the creditor had that recourse. 3 *Norton Bankr.L. & Prac.* § 57.01. Collier summarizes the purpose of Section 1111(b) as follows:

"Section 1111(b) represents an attempt by Congress to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment. On the one hand, Section 1111(b), taken in conjunction with Section 1124 and 1129, gives the debtor the power to retain encumbered property essential to the debtor's reorganization and to obtain confirmation of its plan in the face of opposition by a class of creditors whose claims are secured by such property. This preserves the debtor's ability to reorganize. On the other hand, Sections 1111(b), 1124 and 1129 permit the secured lender to protect itself so as to insure reasonable treatment under a plan. Thus, Section 1111(b) protects the legitimate expectation of the secured lender that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors."

Bankruptcy Judge Ralph Mabey cogently explained in *In Re South Village, Inc.,* 25 B.R. 987, 999 how Section 1111(b) was designed to prevent a reptition of the *Pine Gate* scenario:

"Section 1111(b) prevents an encore of *Pine Gate* in two ways. First, if a nonrecourse mortagee is substantially undersecured, so that he dominates the vote of the class of unsecured claims, he may retain the recourse status conferred by Section 1111(b)(1)(A), not electing under Section 1111(b)(2), and cause that class of claims to dissent under the plan. See, 11 U.S.C., § 1126(c). The plan may not be confirmed under these circumstances, see, 11 U.S.C. § 1129(a)(8), absent a cramdown under 11 U.S.C. § 1129(b)(2)(B). Cramdown under Section 1129(b)(2)(B) requires either that the unsecured claims be paid in full or that junior interests receive nothing under the plan. Hence, the debtor must propose a plan which satisfies the unsecured debt or which eliminates his interest in the property. CF. *In Re Pine Lake Village Apartment Co.,* 19 B.R. 819, 831–833 (Bankr.S.D.N.Y.1982). Either option is contrary to the result reached in *Pine Gate.* Second, if the creditor elects under Section 1111(b)(2), *he loses his recourse status,* and any unsecured claim, but gains an allowed secured claim for the amount of the debt, not the value of the property. Hence, unlike the lender in *Pine Gate,* he may benefit from any increase in the value of the property."

With respect to non-recourse undersecured creditors such as the creditors involved in the instant contested matter, Section 1111(b) allows an undersecured creditor to escape the non-recourse terms of their loan documents if the debtor wishes to use the creditor's property in the reorganization process. Section 1111(b) modifies the definition of "allowed secured claim" for the protection of undersecured creditors in Chapter 11.[3] It provides that nonrecourse claims will be treated as recourse claims (despite the terms of the loan documents), permitting any undersecured amount, which would otherwise be disallowed, to participate in distributions made to unsecured creditors under a plan.

**3.** "Allowed secured claim" is defined at 11 U.S.C. § 506(a). If the creditor has a lien against property, and if he is oversecured, the allowed secured claim is the amount of the debt. If he is undersecured, it is the value of the property. In other words, § 506(a) separates an undersecured creditor's claim into two claims—an allowed secured claim equal to the value of the collateral and an unsecured claim equal to the balance of the debt. *In Re South Village, Inc.,* 25 B.R. 987, 989 n. 2 (Bankr.Utah 1982).

The transformation of non-recourse claims into recourse claims is for distribution purposes only in a Chapter 11 reorganization case where the debtor has been given the power to retain encumbered property (over the objection of the secured creditor) for use in its plan of reorganization. "It was obviously not intended by according recourse [status] to non-recourse claims that the holders of these claims would be given any additional rights under state law." 3 *Norton Bankr.L & Prac.* § 57.02.

There are two instances, however, where a recourse claim does not arise. The first exception is the "§ 1111(b)(2) election" exception. If the § 1111(b)(2) election is made by a non-recourse lender, the non-recourse lender's lien on the property continues to secure the *entire* outstanding indebtedness and not merely the value of the property during a potentially "slump" market. If the non-recourse creditor elects under Section 1111(b)(2), he loses the recourse status given to him under Section 1111(b) and thus any right to an unsecured deficiency claim, but gains an allowed secured claim for the amount of the total indebtedness, not just the potentially depressed value of the property. Unlike the lender in *Pine Gate*, the undersecured creditor may now benefit from any future increase in the value of the property.[4]

The second exception to the Chapter 11 general rule of recourse treatment of non-recourse creditors is the Section 1111(b) "sale of the collateral" exception which is the subject of this contested matter. Section 1111(b)(1)(A)(ii) expressly provides that recourse treatment is denied to a a non-recourse claim holder where the property securing the claim is sold under Section 363 prior to confirmation or is to be sold under the plan of reorganization. (*i.e.* the Debtor intends to keep the property for use or sale during the reorganization process). According to the legislative history, "sale of property under Section 363 or under the

plan is excluded from treatment under Section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under Section 363(k) of the House amendment." Bankr.L.Ed., LEGISLATIVE HISTORY § 81:3.

The ability of the non-recourse lender to purchase its collateral at a sale, with a credit offset allowed for any bid up to the full amount of its debt, insures that the lender is protected. If the property is being sold for less than the outstanding indebtedness and the lender feels this price is too low or if it feels future appreciation will be meaningful, it may bid the full amount of its debt at the sale and take title to the property. With this protection, the non-recourse secured lender does not need and therefore is not given the statutory protection of § 1111(b). The draftsmen of the Code clearly intended to protect the non-recourse undersecured creditor in Chapter 11 reorganizations *only* if the creditor *is not permitted* to purchase the collateral at a sale or if the debtor intends to retain the collateral after bankruptcy and not repay the debt in full. 15 COLLIER ON BANKRUPTCY ¶ 1111.02 at 1111–24 (15th ed. 1985).

The Debtors torture the clear language of Section 1111(b)(1)(A)(ii) when they assert that a foreclosure sale is a "Section 363 sale". Unquestionably, a foreclosure sale is not encompassed within a Section 363 sale. A foreclosure sale is conducted pursuant to the mortgage agreement of the parties and state law while a Section 363 sale is purely a creature of federal bankruptcy law. However, abandonment and foreclosure of the property are similar to a Section 363 sale in that the creditor is permitted to purchase his collateral by bidding in the full amount of its debt. Thus, abandonment and foreclosure allows the creditor the opportunity to preserve the benefit

---

**4.** This exception is not at issue in these cases, if for no other reason that none of the secured creditors have made an "election" within the time period set forth in Rule 3014 of the Bankruptcy Rules. The reason is obvious. If the foreclosure sale resulted in sufficient proceeds

to totally liquidate the debt, the creditor no longer cares. If the sale resulted in a deficiency, the creditor would certainly like to receive its pro-rata portion of any distribution made to the class of unsecured creditors (which would include deficiency claims).

of its original bargain with the debtor, *i.e.* payment in full of the debt or a return of the property.

The failure to include abandonments or motions to lift stay in the specific statutory exceptions to the recourse treatment of non-recourse claims under § 1111(b) has been considered an unintentional omission, rather than an expression of Congressional intent, because the effect of abandonment or relief from the stay is the same as the effect of a sale under § 363 or the plan. Collier discusses this apparent unintentional omission in 15 COLLIER ON BANKRUPTCY ¶ 1111.02 at 1111–24:

> "Although the language of section 1111(b) does not refer specifically to abandonments, *if the property is not sold, but is abandoned or returned to the secured party, the nonrecourse deficiency claim should disappear.*
>
> While section 1111(b)(1)(A)(ii) converts a nonrecourse claim into a recourse claim unless the property is sold under section 363 or under the plan, the subparagraph does not mention abandonment. *This may well constitute an omission rather than an expression of the intent of Congress. The effect of abandonment is the same as the effect of a sale under Section 363 or under the plan*". (emphasis added)

Although the language of § 1111(b) does not specifically refer to dispositions of property of the estate pursuant to a motion for relief from the automatic stay or abandonment to the secured creditor, this Court holds that the Congressional intent is nevertheless clear that such dispositions are equally applicable exceptions to the general rule regarding transformation of the non-recourse creditor into a recourse creditor.[5] In effect, a non-recourse, undersecured creditor has "waived" its right to recourse status under Section 1111(b)(1)(A) by seeking and obtaining pos-

session of their collateral pursuant to a motion for relief from stay or motion for abandonment.

The safeguards placed in the Code for non-recourse creditors were placed there to protect the creditor where the Debtor intends to *keep* the property for sale or use in the reorganization process. In other words, conversion of non-recourse claims to recourse claims is the "price" the debtor pays to use encumbered property in its reorganization over the objection of the secured creditor. If the property is voluntarily or involuntarily returned to the secured creditor, the non-recourse secured creditor is no longer entitled to this preferred status.

Based upon the foregoing discussion, IT IS ORDERED that the Objection to the proposed Disclosure Statement filed by Treehouse Associates Ltd. Partnership is hereby OVERRULED.

---

5. This Court is certainly mindful of the Supreme Court's admonition that the courts should not read into unqualified statutory language exeptions based upon legislative history unless that legislative history demonstrates with extraordinary clarity that this was indeed the intent of Congress. *Midlantic National Bank v.*

*N.J. Dept. of E.P.,* —— U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (Rehnquist, dissenting); *Garcia v. United States,* 469 U.S. ——, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472, 477–78 (1984). This Court believes the instant case is such a case.