**In re RAYLIN DEVELOPMENT CO., Debtor.**

**Bankruptcy No. 88–12217.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

June 30, 1989.

Eric R. Borsheim, Austin, Tex., for Raylin Development Co.

Joseph D. Martinec, Austin, Tex., for Raymond Mitchell.

Mark Browning, Austin, Tex., for Collecting Bank.

ORDER ON MOTION FOR
VALUATION OF ASSETS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motion of First City National Bank of Austin for Valuation of certain assets, to wit, two parcels of property. One tract is a 12.07 acre parcel of unimproved land on RR 620 in Williamson County, Texas, within the extraterritorial jurisdiction (ETJ) of Austin, Texas. The other is 93 lots in Alum Creek Estates, in Bastrop County, Texas. First City desires to "set" its secured claim in this case in part to determine the size of its unsecured deficiency case in the related case of Raymond and Linouise Mitchell. The hearing stretched over three different days, and the court heard in excess of ten hours of valuation-related testimony.

First City [1] put in an appraisal on the 12.07 acre tract, valuing the property at

---

1. We will refer to the bank by this single name, though in fact the interested entity is Collecting Bank, N.A. Old First City was sold to the Rob- ert Abboud interests in an FDIC-assisted "open-bank" takeover transaction. As a result of the transaction, two new banks were created, one

$1,370,000 as of February 1989, assuming a reasonable holding period and exposure to the market. Their valuation assumes that the highest and best use for the property is sale to an investor who would in turn resell the property in pieces for "pad sites." [2] The 93 lots were valued at $495,000, again assuming a three year absorption period.

The debtor's principal, Raymond Mitchell (who has been in the land development business for many years and who is also in bankruptcy), valued the 93 lots using a "discounted cash flow" technique of his own invention. He concluded the lots were worth $716,100. The debtor also submitted an appraisal of the usual type for the 12.07 tract, which concluded the property was worth $3,155,000.

The range of values thus extends over $1.7 million on the large tract, and over $200,000 on the 93 lots. The valuation will have a significant impact on Raymond Mitchell's individual case, as a large deficiency will give First City domination over the unsecured class of creditors, and may also affect the liquidation analysis in that case. The valuation testimony presented, however, is not at all helpful in resolving this central bankruptcy issue. Each appraiser was quick to point out errors in the other's appraisal, picking on the age, locale, size and desirability of comparables, on holding periods, discount rates, and presumed use assumptions, and even on the mathematical accuracy of computations. One could plunge into the details of these criticisms to select the less objectionable approach, but would still be left knowing nothing more about what these properties are actually worth. The spread of values demonstrates just how right Judge Steen was when he commented that there is nothing more dubitable than appraisals. *In re Sandy Ridge Development Corp.*, 77 B.R. 69, 73 (Bankr.M.D.La.1987).

In response to this imprecision, the debtor offered an alternative approach to the valuation process through three witnesses, all advocates of the so-called "investment value approach" (IVA). This novel approach breaks a cardinal principle of traditional appraisal technique by evaluating worth from the point of view of the *current* owner and/or buyer, rather than the hypothetical buyer and seller. It takes seriously the highest and best use, but posits what an actual investor would be willing to pay for the property to use it in that way. Though the approach relies on the information that can be gleaned from comparables, it does not engage in the fiction of non-existent willing buyers and willing sellers operating in a nonexistent marketplace. It also divorces itself from the peculiar exigencies of the current market and instead strives to derive an economic model to approximate a "real" value for the property in question.[3]

Section 506(a) directs a court to derive values with a view to the purpose for which valuation is requested and in light of the proposed disposition or use of the property. 11 U.S.C. § 506(a) (1982 & Supp. IV 1986). Courts are not so much directed to "find" the value of a given property, as they are to "set" the value for purposes of the bankruptcy process. *See In re Terrace Gardens Park, Partnership*, 96 B.R. 707

operating under the name First City Bank, the other under Collecting Bank, N.A. Collecting Bank's stock is owned by former First City shareholders and the FDIC. Collecting Bank does not actually accept deposits or make loans. Instead, it operates as an affiliate, liquidating weak assets of former First City and using proceeds to repay a note to new First City. The note represents the "purchase price" for the weak assets. The notes of Collecting Bank to new First City are treated as an asset of new First City. In this fashion, write-offs and reserves were converted into an asset, insured in part by the FDIC, which has agreed to "cover" approximately $870 million of the Collecting Bank notes.

**2.** Small commercial uses, such as convenience stores, restaurants, dealerships, and day care centers.

**3.** One expert reminded the court that, just as current appraisal values tend to be low, reflecting the current depressed marketplace, the loans on many of those properties were supported by appraisals generated in the boom years of the early 1980's, when speculation had driven "comparable sales" through the clouds. Focusing on the exigencies of the moment tends to project market aberrations into the future, punishing either the lender foolish enough to lend against high valuations, or the borrower unfortunate enough to face loss of the property by foreclosure in a time of low valuations.

(Bankr.W.D.Tex.1989); H.R.Rep. No. 595, 95th Cong., 1st Sess. 356, *reprinted in* 1978 U.S.Code Cong. & Admin:News 5787, 5963, 6312 ("courts will have to determine value on a case by case basis, taking into account the facts of each case and the competing interests in the case").

In addition, the court does not actually value the *property* but rather the *creditor's interest* in the property. *See* J. Queenan, *Valuation of Security Interests*, 92 Comm.L.J. 19, 30 (1987). As a result, valuation must be approached in large part from the point of view of what the collateral would be worth *in the hands of the creditor* under the circumstances of the case. The seminal decision of now District Judge Conrad Cyr in *In re American Kitchen Foods, Inc.* is consistent with this understanding, proposing as the standard for valuation that value realized by the *most* commercially reasonable disposition of the property practical under the circumstances. *Chemical Bank and First Pennsylvania Bank, N.A. v. American Kitchen Foods, Inc. (In re American Kitchen Foods, Inc.)*, 2 B.C.D. 715 (Bankr.D.Me. 1976). This approach borrows the Uniform Commercial Code standard of commercial reasonableness found in section 9–504, which dictates the manner in which lenders are to dispose of personal property upon foreclosure.[4] However,

> the creditor is under no obligation to select the best of several commercially reasonable methods [under the UCC standard]. *American Kitchen's* subtle subversion of the standard of commercial reasonableness makes sense in a Chapter 11 proceeding. The UCC standard is intended to measure past conduct for the purpose of imposing liability.... Valuations of security interests in bankruptcy

involve no such considerations. A bankruptcy court views the method of disposition *prospectively,* apart from any claim of liability [on the part of the lender].

*Valuation of Security Interests, supra* at 23. Courts are entitled to inquire after what method available to a given lender is *most* likely to yield the *most* value. It is important to highlight the two significant features of this inquiry: (1) the method must be reasonably available to the lender in question, and (2) the method which yields the *most net value* is the one desired by the courts.[5]

The IVA valuation approach is helpful in this regard, because it focuses scrutiny on the real situation of the lender and the debtor. It hypothesizes an *actual* economic use of the property, then searches for the value each of the respective parties could realistically expect to realize exploiting that hypothesized land use. It is easier to incorporate risk factors into this model of valuation, and so easier for the court to do the job imposed by section 506(a). At the same time, however, because IVA posits value from the point of view of the particular seller, it assumes that the creditor, can make use of the land use proposal upon which it rests. Therefore, in order to apply the IVA valuation approach here described, we must first decide whether the proposed land use is indeed realistic and consistent with the highest and best use of the property. We must then decide whether that means will yield the most net value. Finally, we must decide whether marketing this property in accordance with that proposed land use is a means of disposal of the property reasonably available to this lender.

All agree that the appropriate land use of the 12.07 acre tract is for pad sites.[6]

---

**4.** Commercial reasonableness imposes on a lender a duty to, in good faith, achieve a fair price, without imposing unrealistic expectations in the process. *United States v. Terrey,* 554 F.2d 685, 693 (5th Cir.1977). There are, after all, reasonable limits on the lengths lenders can be expected to go in trying to dispose of collateral. Lenders are lenders, not developers, or manufacturers, or marketers.

**5.** The latter concern mirrors the court's obligation to balance the competing interests of all creditors and the debtor, not just those of the lender. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 356, *reprinted in* 1978 U.S. Cong.Code & Admin. News 5963, 6312.

**6.** Even the bank's appraiser concedes as much, though he postulates an intervening investor on the assumption that the bank itself would not develop and market the property. This disposi-

The land use proposed is, in the opinion of the court, realistic and best reflects the highest and best use of the property. Furthermore, in the opinion of the court, it is far and away the utilization best calculated to yield the highest value for the property.

Using the land use plan developed by one expert, and the IVA technique outlined by the economist, a third expert with unimpeachable qualifications as an appraiser found the property to have a value to the similarly situated investor of just over $3 million. Even after incorporating modifications for different holding periods, cost of funds, and discount rates, a range of values around $3 million was still yielded. Further "take-outs" for development and holding costs are appropriate, however. The court allows deductions for bringing sewer to the property ($110,000), for legal expenses associated with re-zoning ($10,000), for taxes ($75,000), and for marketing costs, at 9% ($270,000). Using the lowest IVA-yielded value of $2.9 million, we arrive at an indicated value of $2,435,000. The bank contends that the IVA value is inflated, and showed a video "tour of the neighborhood" to show that there are already too many pad sites nearby, that RR 620 is not as heavily traveled as nearby U.S. 183, which crosses RR 620, that it will be years before anyone *really* wants a pad site here, and so forth.[7] The court lends greater credence to the expert testimony than it does to the video in this case, and concludes that the proposed land use is most likely to achieve the maximum value for this property.

We ask then whether this method of disposition is one reasonably available to this lender. The bank argues that it is not really in a position to throw good money after bad, bringing sewer to the property and trying to market the pad sites to prospective purchasers. It is not a developer, after all, but is merely a bank. The flaw in this argument is that, in fact, Collecting Bank, N.A. is *not* merely a bank, at least not in the generally understood sense of the word. It accepts no deposits and makes no loans. It merely holds bad loans and property that is difficult to dispose of, one step removed from the true operating bank, First City. It owes unsecured notes to First City, which are supposed to be funded out of returns on the bad loans which were transferred to it in the merger at a percentage of book value.[8] These notes are set at prime, but do not bear any particular relation to "cost of funds," which Collecting Bank does not have. Collecting Bank's shareholders are former shareholders of old First City, who also received stock in new First City at ten cents on the dollar. Collecting Bank's registration statement acknowledged that it would be "unlikely" that any equity would be realized on the assets, and it is safe to say that shareholders place their principal expectation of a return on their *new* First City stock doing well. One could posit some expectation of value on the part of new First City in the note receivable from Collecting Bank, but in truth, First City realized the principal expected benefit at the moment of merger, when $3.3 billion

tion represents not the *highest* and *best* use of the property, but the *second-best* use, to which a bank might resort for business reasons that have more to do with the bank's situation than with the property. This particular bank, Collecting Bank, N.A., does not face many of the constraints of the usual bank that would prevent developing and marketing the property over time, because this bank's job is to realize the best possible return on assets to maximize the value of the note to First City and to minimize the exposure of the FDIC (and perhaps ultimately the taxpayer). An ordinary bank, by contrast, might be required by regulation to "wholesale" the property.

7. The court gives greater credence to the actual purchase offers Mitchell received for a Payless

convenience store and, later, a Diamond Shamrock convenience store on the prime corner site. These offers fell through at least in part due to the confusion visited on the bank by the FDIC-assisted sale of the bank during this period. The court also finds persuasive the anticipated expansion of RR 620 into a new "outer loop" for the City of Austin, a factor which would strongly influence any potential investor.

8. First City sold $3.3 billion worth of loans to Collecting Bank, in exchange for notes totalling $1.9 billion. The FDIC has agreed to guaranty $870 million of these loans, assuring First City that at least that much of the Collecting Bank notes may be treated on First City's books as an asset.

worth of bad loans were removed from the books, and with them the associated reserve requirements, and replaced with a putative "asset," the $1.9 billion note from Collecting Bank, only $870 million of which it is assured of collecting by virtue of the FDIC's guaranty.

All of this suggests that Collecting Bank's true role is similar to that of the FDIC acting in its corporate capacity. *See* 12 U.S.C. § 1823 (1982 & Supp. IV 1986). The differences are significant, however. First of all, Collecting Bank does not operate under the onus of having to comply with the myriad of federal regulations which so often render the FDIC so laboriously inefficient. Second, Collecting Bank is not accountable to depositors, only to shareholders who have little if any expectation of a return. Collecting Bank is thus in a unique position to dispose of assets in a relatively unfettered fashion, as these things go with banks. If it does not realize immediate returns, the most serious immediate consequence is that it might default on its interest payments to First City. Given the economic realities of the relationship, such a default is not likely to have immediate repercussions. The FDIC expects a return on investment, but the structure itself betrays the FDIC's implicit belief that a relatively unencumbered institution is more likely to realize a better return long-term than would the FDIC itself operating in its corporate capacity.[9]

This court does not believe that Collecting Bank operates entirely without restrictions—it could not still bear the name "National Association," indicating its formation under the federal laws which regulate banking in this country. 12 U.S.C. § 37

(1982 & Supp. IV 1986). No evidence was put on to suggest that Collecting Bank could not, if it so desired, pursue a marketing plan consistent with the land use plan proposed at the hearing. Even if the bank itself could not (or would not) pursue the plan using its own staff, it is not unreasonable to posit the bank's contracting the task out to one of the dozens of hungry real estate developers and marketers now available in Austin, Texas. This court concludes that disposing of this property by such means is reasonably available to an entity such as Collecting Bank, and, therefore, it is appropriate to posit this disposition as the "most commercially reasonable" means of disposing of the property.[10]

The Court is next required to examine the concept of risk allocation. Here, Collecting Bank has the ability (indeed the mandate) to achieve the maximum return on the property, for its shareholders, especially the FDIC. It makes no loans, accepts no deposits. It simply serves as a device into which new First City has spun off its bad loans and improved its balance sheet. If there is any entity with which we should be solicitous, it is the FDIC, which has guaranteed some $870 million of Collecting Bank debt to First City. That entity, however, also has the most to gain long-term by a sensible, well-planned development and marketing of the property. It also has the resources. It is safe to say that, upon foreclosure, Collecting Bank is in a position to wisely market the property to minimize its loss exposure. Unsecured creditors have a right to expect, to count on, and to benefit from prudent disposition by under secured creditors of their collateral.

---

**9.** A belief no doubt formed after five years of painful experience liquidating bad bank loans in the oil patch.

**10.** The court acknowledges that all of the foregoing assumes that the bank will be the successful bidder at foreclosure. There is certainly no reason to conclusively *presume* that result, but in the context of valuation, this court should certainly take judicial notice that lenders in this state are bidding in property at "fair value" to prevent liability under *Durrett*. *Durrett v. Washington Nat'l. Life Ins.*, 621 F.2d 201 (5th Cir.1980). The bank's officer testified to as

much at the hearing. The bank will not let property go at foreclosure for a fraction of value in this current litigious environment even if there is a willing buyer at the foreclosure sale. This is especially the case in Texas, where foreclosure is nonjudicial and follows a mere twenty-one days' notice, allowing no time whatsoever for exposure to the market. The question here is what value would the prudent, similarly situated lender bid in, taking into account the likely ultimate disposition of the property once it takes title after the foreclosure.

By the same token, it is entirely possible that the land use plan *is* overly optimistic, and that Collecting Bank will *not* be able to realize the value that the debtor's experts envision. The Collecting Bank's secured claim will set its deficiency, that deficiency will in turn dictate its participation in the Raymond Mitchell case. We need to take into account the impact of an over optimistic valuation on the creditor's unsecured claim.[11] The court believes that a "risk factor" would be best reflected in the sort of return that the typical investor in the current marketplace would insist upon before investing in this sort of property in Texas. The bank's appraiser assumed that an equity yield of 14% would be the minimum a passive investor would expect on this sort of investment. This court has heard testimony in numerous cases involving expected rates of return and takes judicial notice that spreads of 6 points over prime are the norm in a high-risk market such as Texas is perceived to be.[12] Applying that spread to the value suggested above would generate a "risk factor" deduction of about $150,000. Thus, the court "sets" the value of the 12.07 acre tract for purposes of section 506(a) at $2,283,500, say $2,285,000.

Considerably less effort need be expended with respect to the 93 lots. Only one appraisal was submitted. That appraisal already incorporates an equity yield rate of 14%, approximating the downside risk to the bank. This appraisal also assumes holding the lots for a period of years until a bulk purchaser could be found.[13]

11. By setting the secured claim, the court also sets (and potentially reduces) the unsecured deficiency claim as well. Every dollar of claim reduction is a dollar less claim on the assets of the Raymond Mitchell claim, and constitutes a "taking" of property. It is this "taking" with which the court in *Sandy Ridge* was justifiably concerned.

12. This court does not necessarily concur in that perception.

13. No one questioned the likelihood of Collecting Bank holding and marketing these properties over a three year period, lending further credence to this court's belief that Collecting Bank is equally capable of holding and marketing for pad sites the 12.07 acre tract on RR 620.

The court accepts the value as given by the bank's appraiser—$495,000.

These value findings apply to both this case and the Raymond and Linouise Mitchell case.[14] For purposes of the Raymond Mitchell case, then, the court finds an unsecured deficiency of $450,105 to have been generated.[15]

So ORDERED.

14. Counsel for the debtor in the individual case participated in this hearing, and all parties have expressed their intention that the decision here apply in the Raymond Mitchell case as well, as a plan is currently pending in that case.

15. It is important to emphasize the narrow role of this decision. Section 506(a) imposes a highly specialized task on a bankruptcy court to *set* valuation—individualized to the exigencies of the case, incorporating with factors approximate to the balancing of equities typical of bankruptcy cases. The valuation of necessity has limited ability for other purposes, such as fair market valuations for state law purposes, fraudulent conveyance analysis, and the like.