**In re MESA BUSINESS PARK PARTNERSHIP, Debtor.**

**Bankruptcy No. 90–31341–C.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

March 6, 1991.

Donald S. Leslie, Diamond, Rash, Leslie, Smith & Samaniego, El Paso, Tex., for Mesa Business.

William B. Kingman, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, Tex., for creditor Fidelity Mutual.

## DECISION ON DEBTOR'S MOTION FOR VALUATION AND CREDITOR'S MOTION TO ANNUL OR MODIFY STAY

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motion of Debtor for Valuation, and the motion of creditor to Annul or Modify Stay. Upon consideration of these motions, the court enters this memorandum of decision thereon.

After efforts to negotiate a compromise of Mesa Business Park Partnership's first lien indebtedness on its sole asset (a piece of property improved with a business park development), the partnership and its partners faced foreclosure by the first lien lender, Fidelity Mutual Life Insurance Company ("Fidelity"). The partners, of

course, feared that the foreclosure would yield a value far short of the true value of the collateral, resulting in a larger deficiency claim against them. The general partners had also signed absolute guaranties which, under Texas law, are enforceable regardless whether the lender resorts to the collateral, and are not contingent upon the lender's first pursuing the primary obligor. *Goff v. Southmost Sav. & Loan Ass'n,* 758 S.W.2d 822, 824 (Tex.App.—Corpus Christi 1988, writ den.); *see generally Houston Sash & Door Co., Inc. v. Heaner,* 577 S.W.2d 217 (Tex.1979); *Universal Metals & Machinery, Inc. v. Bohart,* 539 S.W.2d 874 (Tex.1976) (absolute guarantors are primarily liable independent of the liability of the primary obligor).[1]

Faced with these prospects, the guarantor partners caused the partnership to file bankruptcy, bare hours before the scheduled foreclosure. The lender, however, did not know of the filing and proceeded with the foreclosure. The lender had had the property appraised the week before for $1.45 million. At the foreclosure sale, the lender made a credit bid of $1.15 million, approximately 70% of the appraised fair value. Evidently, no one else bid on the property (including the partnership, its partners, or the second lienholder, Southwestern Federal Savings Bank).

Not long after the bankruptcy filing, the debtor partnership filed a motion for valuation of the property, relying on Section 506(a), the Fifth Circuit's decision in *Sandy Ridge Development,* and this court's ruling in *Saunders. See* 11 U.S.C. § 506(a); *In re Sandy Ridge Development, Inc.,* 881 F.2d 1346 (5th Cir.1989); *In re Saunders,* 112 B.R. 844 (Bankr.W.D.Tex.1990). Fideli-

ty responded by seeking an annulment of the automatic stay, so that the foreclosure sale would then be validated after the fact.[2]

Fidelity strongly urges that the valuation brought by the debtor serves no purpose, especially if the stay is annulled. An annulment would mean that the property ceased to be property of the estate effective the date of the foreclosure sale in December, rendering a valuation hearing moot. *See In re Saunders,* 112 B.R. at 846. Even without an annulment, the lender argues that valuation is inappropriate. Such a valuation would serve no bankruptcy purpose because the debtor does not intend to keep the property, and has nothing else to reorganize.[3] The lender points out that the real motivation for the valuation is to benefit the guarantor partners, who hope the valuation finding would set the deficiency claim the lender would assert against them, superseding the deficiency that would otherwise be determined by the price paid for the property at the foreclosure sale.

The debtor counters that it is merely seeking to employ a device statutorily granted any debtor in bankruptcy by Section 506(a). It adds that, but for that provision, both the debtor and its guarantor partners would be deprived as a practical matter of any forum in which to assure that they are properly credited with the true value of the property. They point out that, under Texas case law, a lender is allowed to bid in virtually any price it wants at a foreclosure sale, even one far less than the actual value of the collateral, leaving the lender to, in effect, unilaterally

**1.** The court does not here suggest that the guarantors would not be able to assert wrongful foreclosure as an affirmative defense to their liability on their absolute guaranties. Texas appears to permit such defenses in certain cases. *See Morgan v. Amarillo Nat. Bank,* 699 S.W.2d 930, 936 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). Whether such a defense would be available to the guarantors is not before this court.

**2.** Courts are split over whether an act done in violation of the stay is void or merely voidable. *Compare In re Ward,* 837 F.2d 124, 125 (3rd Cir.1988) *with In re Godfrey,* 102 B.R. 769, 771 (Bankr. 9th Cir.1989); *In re Oliver,* 38 B.R. 245,

247–48 (Bankr.D.Minn.1984). Fidelity and the debtor did not expressly address this issue in their arguments, but the lender would want an order lifting the stay anyway just to clear the title to the property, regardless of which theory is adopted. Even if the foreclosure is only voidable, it could conceivably be set aside at any time, placing the chain of title in jeopardy after the fact.

**3.** The debtor acknowledges that it does not oppose relief from the stay, so long as the property is valued before it leaves the estate.

set the deficiency claim against both debtor and guarantors, without any controls to protect them against artificially inflated deficiency claims. The debtor notes that, in this case for example, the lender bid $300,000 less than the market value as determined by an appraisal commissioned by the lender itself, confirming the injustice of the state law system for setting deficiencies.[4] Bankruptcy gives the debtor an alternative forum within which to rectify this perceived injustice, and principles of collateral estoppel permit the guarantor partners to benefit from the bankruptcy determination of value, according to the debtor.[5] These partners are parties in interest and their interests, argues the debtor, are a proper consideration for the bankruptcy court presiding over the partnership's bankruptcy.[6]

■ The debtor has acknowledged that it does not oppose the property's going back to the lender, so long as it can first obtain a valuation. It opposes an annulment of the stay because it might render the valuation moot. *See In re Saunders*, 112 B.R. at 846.

The single question before the court is this. May a debtor obtain a valuation of property for the sake of valuation alone? The debtor acknowledges there is no equity in the property, so valuation is not required for that purpose.[7] Clearly, no reorganization purpose for the valuation was contemplated, because the debtor's only source of income with which to fund a plan is the very property which is voluntarily going back to the lender. The debtor gave no indication of any other purpose for the valuation, other than to set the deficiency claim for the benefit of the guarantor partners.

At least two courts presented with this issue have concluded that in these circumstances valuation is not appropriate. *In re Richardson*, 97 B.R. 161, 162 (Bankr.W.D. N.Y.1989); *accord, In re Turnbow*, 121 B.R. 11, 13 (Bankr.S.D.Tex.1990). These courts observe that a Section 506(a) valuation requires some context in order for the procedure to be invoked, and that the lack of such a bankruptcy related context would deprive the bankruptcy court of the jurisdiction to even make what would be essentially an advisory decision. *In re Turnbow*, 121 B.R. at 13, *citing In re Richardson, supra* and *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

■ This court, in *Saunders*, suggested that the need to determine the allowed unsecured claim of a lender itself justifies using the section to value the lender's collateral. *In re Saunders*, 112 B.R. at 846–47. There is no reason to depart from that observation as a general proposition. However, if there is no need in a given case

---

4. In Texas, foreclosures are almost always nonjudicial. Only if foreclosure is "wrongful" can it be enjoined or undone. Mere inadequacy of consideration does not normally render a foreclosure wrongful in Texas. *Tarrant Sav. Ass'n. v. Lucky Homes, Inc.*, 390 S.W.2d 473 (Tex. 1965). The price paid at foreclosure will thus not usually be the subject of judicial review in Texas. *But see Sunjet, Inc. v. Ford Motor Credit Co.*, 703 S.W.2d 285 (Tex.App.—Dallas 1985, no writ); *Chase Commercial Corp. v. Datapoint Corp.*, 774 S.W.2d 359 (Tex.App.—Dallas 1989, no writ); *Greathouse v. Charter Nat. Bank—Southwest*, 795 S.W.2d 1 (Tex.App.—Houston [1st Dist.] 1990, writ granted); *Smith v. FDIC*, 800 S.W.2d 648 (Tex.App.—Houston [14th Dist.] 1990, writ dism'd) (all cases generally criticizing *Lucky Homes*).

5. The debtor cites for support a Texas case to the effect that a bankruptcy court's determination of an issue may operate as collateral estoppel to prevent retrial of the same issue in state court. *Wilhite v. Adams, Trustee*, 640 S.W.2d

875, 876 (Tex.1982). The case does not address whether a valuation determination under Section 506(a) with respect to an asset of a partnership would operate as collateral estoppel in a state court trial by a lender to recover on a deficiency judgment against a partner or guarantor.

6. The debtor also argues that the second lienholder has an interest in a valuation, as their claim on remaining estate assets would be affected by the size of Fidelity's deficiency claim. The second lienholder, however, has not participated in these proceedings to date, though it has had notice of these pleadings and the hearings held on them.

7. In its response to the lift stay motion, the debtor acknowledged it had no equity in the property. 11 U.S.C. § 362(d)(2)(A). The court then excluded testimony to the contrary proffered by the debtor at trial, on principles of judicial estoppel.

to make that determination, that purpose will not of itself justify its use.

In this case, the debtor has no need to set the deficiency claim of Fidelity against the estate. The debtor gave no indication at the hearing that it had any other assets available for distribution to creditors, so determining allowed unsecured claims makes no more sense here than it would in a no-asset chapter seven liquidation case.[8] Indeed, creditors in no-asset chapter seven cases are not even required to *file* proofs of claim. *See* Bankr.R. 3002(c)(5), 2002(c). There is no real and substantial controversy in such circumstances to warrant a determination of the allowed amount of the unsecured claims against the estate, depriving the federal court of the "actual case or controversy" prerequisite to the proper invocation of its jurisdiction. *In re Turnbow*, 121 B.R. at 13; *cf. In re Peerman*, 109 B.R. 718 (Bankr.W.D.Tex.1989) (articulated bankruptcy purpose for the bankruptcy valuation); *In re Raylin Development, Inc.*, 110 B.R. 259 (Bankr.W.D.Tex.1989) (same).

Even if there were assets to distribute, there would still be no real justification here for this court's valuing this property. The note in question is nonrecourse, so that no deficiency would arise against the debtor in this chapter 11 case but for the operation of Section 1111(b). That section gives nonrecourse lenders recourse status in a chapter 11 case. 11 U.S.C. § 1111(b)(1)(A). The section was enacted to protect undersecured nonrecourse lenders from the harsh results of Bankruptcy Act cases such as *Pine Gate Associates, Ltd.*, in which the nonrecourse lender was cashed out in a Chapter XII plan for the then depressed value of the collateral, over the vociferous objections of the lender. *Great National Life Ins. Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr.N.D.Ga.1976);[9] *see* 124 Cong Rec H11094, H11103 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); *Matter of DRW Property Co. 82*, 57 B.R. 987, 989 (Bankr.N.D.Tex.1986); *In re South Village, Inc.*, 25 B.R. 987, 999 (Bankr.D.Utah 1982); *see also* Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Prerogative*, 39 BUS.LAW. 441 (1984); Stein, *Section 1111(b): Providing the Undersecured Creditors with Post–Confirmation Appreciation in the Value of the Collateral*, 56 AM.BANKR.L.J. 195 (1982); Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 AM. BANKR.L.J. 133 (1979); Kaplan, *Nonrecourse Undersecured Creditors Under New Chapter 11—The Section 1111(b) Election: Already a Need for Change*, 53 AM.BANKR.L.J. 269 (1979). Explained the court in *DRW Property*,

> ... Section 1111(b) allows an undersecured creditor to escape the non-recourse terms of their loan documents *if the debtor wishes to use the creditor's property in the reorganization process.* ... It provides that non-recourse claims will be treated as recourse claims (despite the terms of the loan documents), permitting any undersecured amount, which would otherwise be disallowed, to participate in distributions made to unsecured creditors under a plan.
>
> The transformation of non-recourse claims into recourse claims is for distribution purposes only in a Chapter 11 reorganization case where the debtor has been given the power *to retain* encumbered property (over the objection of the secured creditor) for use in its plan of reorganization. "It was obviously not intended by according recourse [status] to non-recourse claims that the holders of these claims would be given any additional rights under state law." 3 *Norton Bankr.L. & Prac.* § 57.02.

---

**8.** Chapter seven trustees in this district are discouraged from objecting to ordinary unsecured claims even in asset cases if the claims will not receive a distribution in any event, because for instance there are only enough assets to satisfy priority claims.

**9.** What made *Pine Gate* especially egregious was that, under Chapter XII of the Act, if the plan made no provision for allowing such lenders an unsecured deficiency claim, "the lenders were not entitled to vote or participate in the unsecured claims class." *Matter of DRW Property Co. 82*, 57 B.R. 987, 990 (Bankr.N.D.Tex.1986).

*In re DRW Property,* 57 B.R. at 991–92 (emphasis added). Judge McConnell goes on to point out that, when the lender has the ability to protect itself against the adverse consequences of a write-down ala *Pine Gate,* such as by making an appropriate credit bid at a foreclosure sale or sale under Section 363, the lender does not need the protection of Section 1111(b). "The draftsmen of the Code clearly intended to protect the non-recourse undersecured creditor in Chapter 11 reorganizations *only* if the creditor *is not permitted* to purchase the collateral at a sale or if the debtor intends to retain the collateral after bankruptcy and not repay the debt in full." *Id.* at 992 (emphasis in original).

Here, no plan is evidently contemplated, much less likely, so Section 1111(b) will not be called into play to serve its purpose of protecting the lender. Neither, therefore, will that section justify a valuation in this chapter 11 case.

That the partners are affected by the amount of the deficiency claim so set does not warrant invoking the Section 506(a) valuation process either. The partnership cannot compel partners to make contributions, so their financial wherewithal does not figure into the estate's financial future, even if reorganization were in prospect. No evidence was presented to indicate that the partners planned to make any capital infusion into the estate voluntarily. *See In re Otero Mills,* 21 B.R. 777, 779 (Bankr.D. N.M.1982), *aff'd* 25 B.R. 1018 (D.N.M.1982) (injunctive relief in favor of nondebtor principals of debtor warranted where the nondebtors' property was to be sold and the proceeds contributed to the plan and such contribution was essential to the success of the reorganization). The fact that the partners' claims against the estate might be set by the amount of the deficiency claim also makes no real difference, again because there is no evidence that a plan is in prospect, or that there will be any assets available to pay the partners' claims.

 The debtor's frustration over the apparent unfairness of how Texas permits deficiency claims to be set is certainly understandable. *See In re Saunders,* 112

B.R. at 847 n. 8. That unfairness will not justify the intervention of the bankruptcy court to supersede the impact of state law, absent some independent overarching federal policy to justify pre-empting this exercise of traditional state authority. "In exercising their equitable powers federal courts must recognize 'the special delicacy of the adjustment to be preserved between federal equitable power and state administration of its own law.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 112, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (quoting *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951)). Congress has not, in its enactment of the Bankruptcy Code, explicitly or implicitly preempted the authority of states to determine claims against non-debtor third parties, even if those claims are related in some way to the bankruptcy proceeding. *See generally In re Volpe,* 100 B.R. 840, 847 (Bankr.W.D.Tex.1989), *aff'd,* 120 B.R. 843 (W.D.Tex.1990), *appeal pend.* (5th Cir. 1991) (discussing the three levels of preemption which might arise with respect to a given federal law); L. Tribe, *American Constitutional Law,* 2d ed. § 6–25, p. 479 (Foundation Press 1988). State laws in this area do not so conflict with the federal scheme as to render compliance with both the state and federal law impossible, nor do such state laws stand as an obstacle to the objectives of Congress expressed in the Bankruptcy Code. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

> [W]hile state action is preempted if it specifically frustrates fairly narrow and concrete objectives that underlie federal enactments, no such conclusion follows where the most that can be said is that the direction in which state law pushes someone's actions is in general tension with broad and abstract goals that may be attributed to various federal laws or programs.

> · · · · ·

> [E]ven congressional goals that are tightly-stated will be interpreted narrowly

when testing traditional forms of state action for conflict with those goals.

L. Tribe, *American Constitutional Law,* 2d ed. *supra* at 487, 489 (citing, *inter alia, Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).

■ Because no bankruptcy purpose would be served by pursuing valuation of this collateral in these circumstances, the motion for valuation will be dismissed. The annulment of the automatic stay no longer faces the obstacle of the debtor's needing the property for any cognizable bankruptcy purpose. To force the lender to conduct another foreclosure makes no practical sense, as the December foreclosure was an innocent violation of the automatic stay and otherwise appears to have been properly conducted. The motion to annul the automatic stay will therefore be granted.[10] Counsel for Fidelity Mutual is directed to submit forms of orders consistent with this decision.

SIGNED this 4th day of March, 1991.

---

**10.** Some courts would argue that courts should never annul the stay, while others would contend that there is no need to lift the stay at all. *See* discussion *supra* at note 2. Those that argue the former position worry about encouraging violations of the automatic stay by those who believe that they can always cure the violation after the fact. Those that argue the latter position point out that a violation is merely voidable, so that there is no need to annul the stay to render the act of foreclosure effective. The court eschews both positions on practical grounds. On the one hand, only an innocent foreclosure can qualify for annulment. Those who would "beard the dragon," as it were, by proceeding with foreclosure in reliance on its being "merely voidable" are hardly innocent and so would not qualify for annulment. On the other hand, no prudent lender (or title company) would be satisfied with a post-petition foreclosure sale without an accompanying bankruptcy court order sanctioning it, for the bankruptcy proceeding would otherwise cloud the title. The court can thus decide whether the stay should be annulled based on equitable considerations, wholly apart from whether the foreclosure in question is void or merely voidable.