**In re UNION MEETING PARTNERS, a Pennsylvania partnership, Debtor.**

**Bankruptcy No. 92–17118S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 1, 1993.

Aris J. Karalis, Ciardi, Fishbone & DiDonato, Philadelphia, PA, for debtor.

J. Scott Victor, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Lincoln Nat. Life Ins. Co.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of UNION MEETING PARTNERS ("the Debtor") are (1) the Debtor's request that we confirm its Second Amended Plan of Reorganization ("the Debtor's Plan") over the opposition of Lincoln National Life Insurance Company ("Lincoln"); and (2) Lincoln's request that we confirm its own Amended Plan of Reorganization ("Lincoln's Plan") over the Debtor's opposition.

We find that the Debtor's Plan cannot be confirmed because the rents from its sole asset, two adjoining office buildings, belong to Lincoln and, therefore, cannot be transferred to the Debtor or used to fund its plan. We also find that Lincoln's Plan cannot be confirmed because it (1) improperly provides Lincoln with both the secured Property and an unsecured deficiency claim; and, (2) it overvalues Lincoln's secured claim because it fails to deduct therefrom pre-petition real estate claims.

We will provide both of these parties an opportunity to present further amended plans. However, we note that the Debtor may be unable to undo Lincoln's right to the rents, possession of which is apparently essential to any conceivable plan of the Debtor.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying instant bankruptcy petition on November 17, 1992 ("the Petition Date"). The Debtor is a Pennsylvania general partnership that owns two office buildings collectively known as "Union Meeting One Corporate Center," which are located at 920 A & B Harvest Drive, Blue Bell, Whitpain Township, Pennsylvania ("the Property"). The Debtor's principal business is owning and operating the Property.

The Property consists of 104,381 net rentable feet of office space and it occupies approximately 9.60 acres. The Debtor and Lincoln agreed that, as of May 1, 1993, the fair market value of the Property was $6,600,000.00. After that date, U.S. Healthcare entered into a new, twenty-eight (28) month lease for an additional 26,264 square feet at the Property. The parties have not agreed on the effect that this new lease has upon the value of the Property.

On or about May 19, 1988, the Debtor purchased the Property from E.F. Hansen, Jr. and G. Eileen Hansen ("the Hansens") for $11,100,000.00. The purchase was financed by (1) a loan from Lincoln ("the Lincoln Loan"); (2) a loan from the Hansens ("the Hansens' Loan"); and (3) contributions from the general partners.

The Lincoln Loan was in the original principal amount of $8,800,000.00 and was evidenced by a nonrecourse Mortgage Real Estate Promissory Note ("the Lincoln Note").

The Lincoln Note bears interest at nine and one eighth (9.125%) percent and matured on June 1, 1993. The Lincoln Note was secured by (1) a Mortgage and Security Agreement covering the Property ("the Mortgage"); (2) an Assignment of Rents and Profits ("the Assignment of Rents"); and (3) a Blanket Assignment of Leases (together, "the Loan Documents"). Each of the Loan Documents is dated May 19, 1988. Lincoln properly recorded each of the Loan Documents in the appropriate State and County offices and holds a valid first mortgage on the Property.

The Hansens' Loan, in the original principal amount of $400,000, is evidenced by a promissory note and secured by a mortgage. The Hansens properly recorded and hold a second mortgage on the Property.

There is a dispute as to whether the amount of the purchase price funded by the general partners was a loan or an equity contribution. Regardless of how it is characterized, the general partners provided the Debtor with $2,195,000.00 towards the purchase of the Property. The partners borrowed $1,700,000.00 of this amount from Continental Bank. Since the Property was purchased, the general partners allegedly loaned and/or invested an additional $524,590 in the Debtor.

In March, 1992, the Debtor stopped making payments on the Lincoln Note. On October 5, 1992, Lincoln confessed judgment against the Debtor in the amount of $9,364,-561.40 and commenced on to foreclose the Mortgage against the Debtor in the Court of Common Pleas of Montgomery County, PA. On October 20, 1992, Lincoln sent all tenants at the Property a letter directing them to pay all of their future rents directly to Lincoln. A day before the scheduled judicial sale of the Property, the Debtor filed this bankruptcy case.

Since the Petition Date, the Debtor has continued to manage its affairs and operate the Property as a debtor-in-possession, and has entered into four cash collateral stipulations with Lincoln. On November 25, 1992, at a hearing on the Debtor's initial Motion for Use of Cash Collateral, the parties announced their intention to settle the cash collateral issue. This settlement was not memorialized until this court received a Stipulation Regarding Use of Cash Collateral and Granting of Liens, dated March 5, 1993 ("the First Cash Collateral Stipulation"). The First Cash Collateral Stipulation expired on March 18, 1993. On that date, Lincoln and the Debtor entered into the Second Stipulation Regarding Use of Cash Collateral and Granting of Liens, which was approved by this court on April 15, 1993, and which expired on April 30, 1993. On or about April 29, 1993, the Debtor and Lincoln entered into the Third Stipulation Regarding Use of Cash Collateral and Granting of Liens, which was approved by this court on May 6, 1993. Finally, on or about June 2, 1993, the Debtor and Lincoln entered into the Fourth Stipulation Regarding Use of Cash Collateral and Granting of Liens ("the Fourth Cash Collateral Stipulation"), which was approved by this court on June 9, 1993, and expired on July 29, 1993, the date of the confirmation hearing on the Debtor's First Amended Plan of Reorganization ("the 1st Plan"). The parties orally agreed to extend the Fourth Cash Collateral Stipulation for seven days until August 5, 1993. Currently, there is no cash collateral stipulation in effect.

Pursuant to all four cash collateral stipulations, Lincoln is to collect each tenant's rent and remit a monthly check to the Debtor for payment of all of the Debtor's operating expenses, other than the 1993 school tax, which was due in July, 1993. All amounts in excess of the operating expenses are deposited into a "suspense account" ("the Suspense Account"). In the Fourth Cash Collateral Stipulation, the Debtor and Lincoln agreed that Lincoln would be paid adequate protection payments of $349,250.00 from the funds in the Suspense Account for the period from the Petition Date through July, 1993. The parties also agreed, in the Fourth Cash Collateral Stipulation, that, if the 1st Plan were confirmed, Lincoln would turn over to the Debtor the balance of the funds in the Suspense Account, net of operating expenses and adequate protection payments, and that the Debtor could keep the balance of such funds after it paid the 1993 real estate taxes. Although the Fourth Cash Collateral Stipulation has expired, Lincoln has continued to

deduct monthly adequate protection payments of $41,250 from the rents collected.

On March 5, 1993, the Debtor filed a Motion to extend the period in which it, exclusively, could file a plan of reorganization in this case. Lincoln objected to this motion, but the matter was settled by a stipulation which extended the Debtor's exclusive period for filing a plan of reorganization until April 26, 1993. On or about June 2, 1993, the Debtor and Lincoln entered into a second stipulation to extend the exclusive period until July 31, 1993.

On April 1, 1993, we entered an order requiring the Debtor to file a plan and disclosure statement on or before April 30, 1993. The Debtor complied, and filed an initial plan of reorganization and an accompanying disclosure statement on April 27, 1993. On June 16, 1993, after a series of Objections thereto by Lincoln, and redrafts by the Debtor, we entered an order approving the Debtor's Second Amended Disclosure Statement, which accompanied the 1st Plan.

On June 25, 1993, Lincoln filed a motion seeking relief from the automatic stay in order that it could resume its foreclosure of the Property ("the Stay Motion"). The hearing on the Stay Motion was continued from July 21, 1993, to July 29, 1993, at which time we conducted a lengthy hearing to consider confirmation of the 1st Plan and the Stay Motion. Consistent with our Statements at the end of that hearing, we entered an Order dated July 30, 1993, denying confirmation of the 1st Plan solely because the proposed interest rate of seven (7%) percent to be paid to Lincoln on account of its secured claim was found to be too low. We allowed the stay to remain in effect on the condition that the Debtor and any other party-in-interest would file a further plan of reorganization not inconsistent with our Order of July 30, 1993, with an accompanying supplemental disclosure statement, on or before August 6, 1993. A hearing on any supplemental disclosure statement filed and a continued hearing on the Stay Motion were scheduled on August 18, 1993.

On August 3, 1993, Lincoln filed its initial plan of reorganization. The following day, the Debtor filed a motion to enjoin Lincoln from proceeding with its plan ("the Motion to Enjoin"). On August 5, 1993, Lincoln filed a disclosure statement, a motion to conduct a hearing to consider approval of its disclosure statement on August 18, 1993, and an objection to the Motion to Enjoin.

On August 5, 1993, the Debtor filed the present Debtor's Plan and an accompanying Second Amended Disclosure Statement. On August 17, 1993, Lincoln filed the present Lincoln's Plan and an accompanying amended disclosure statement. After a hearing on August 18, 1993, we denied the Motion to Enjoin, stating that Lincoln's filing of a competing plan was envisioned when we entered our Order of July 30, 1993.[1]

On August 16, 1993, the Debtor filed a Praecipe to Amend its Schedule "F" to add the Debtor's general partners, Frank R. Iacobucci, Sr. ("Frank"); Anthony J. Iacobucci, Frank's brother; Raymond Iacobucci, Frank's nephew; Frank Iacobucci, Jr., Frank's son; and Alan F. Schiffman as undisputed unsecured creditors in the amounts of $662,871, $662,871, $441,914, $441,914, and $510,020, respectively ("the Praecipe to Amend"). Lincoln objected to the Praecipe to Amend, and it was listed for a hearing on September 15, 1993.

On September 2, 1993, Lincoln filed Objections to the Debtor's Plan. On September 3, 1993, the Debtor filed Objections to Lincoln's Plan and a Motion Pursuant to 1126(e) to Strike Ballot Submitted by Lincoln in Support of Lincoln's Amended Plan of Reorganization and to Determine Pursuant to Bankruptcy Rule 3013 that Class 1 of Lincoln's Plan is Not Impaired ("the Ballot Motion"). Lincoln objected to the Ballot Motion. On September 9, 1993, we held a consolidated hearing to consider confirmation regarding both plans and the Ballot Motion, and we

---

1. We were aware that a similar sequence of events had occurred in the case of *In re River Village Associates,* 161 B.R. 127, 130 (Bankr. E.D.Pa.1993) (*"River Village II "*), earlier that month. We advised the parties in this case that we believed that certain issues in this case overlapped with those presented in *River Village.*

agreed to consider the Praecipe to Amend at that time as well. In the course of that hearing, we incorporated the lengthy testimony introduced at the July 29, 1993, hearing on the Debtor's 1st Plan into the record and took brief additional testimony.

After the hearing, we entered an Order of September 10, 1993, directing the parties to file Briefs in support of confirmation of their respective plans, and in opposition to confirmation of the competing plans, on or before October 8, 1993. The later *River Village* briefing schedule was dovetailed to be completed at the same time so that we could consider common issues raised by these two cases together.

The Debtor's Plan provides Lincoln with a secured claim of $6,392,280.08 (rounded off hereafter to $6,392,280) and an unsecured claim of $2,972,281. Deducted from the agreed Property value of $6.6 million (no allowance is made for the U.S. Healthcare lease) is $207,720, which represents local prepetition real estate taxes against the Property. Lincoln's secured claim is the only claim in Class 1. The Debtor is required to make monthly payments of principal and interest on Lincoln's secured claim beginning on the first full month following the Plan's effective date and continuing until July 1, 2003. These monthly payments will be based on an interest rate of nine and one eighth ($9\frac{1}{8}\%$) percent and a thirty-year amortization schedule. On July 1, 2003, the Debtor is required to make a balloon payment equal to the outstanding balance of Lincoln's secured claim. Lincoln will retain the lien of its Mortgage. Lincoln is, however, required to surrender all funds in the Suspense Account to the Debtor for payment of certain real estate taxes.

The claims of general unsecured creditors comprise Class 6. Lincoln's deficiency claim and the Hansens' allegedly totally undersecured claim are treated as general unsecured claims. The Debtor intends to pay ten (10%) percent of these claims, without interest, over two years. The claimants holding these claims are also authorized to receive an additional payment, on the effective date, equal to ten (10%) percent of their allowed claim ("the Additional Payment") if they vote in favor of

the Debtor's Plan and release the Debtor's general partners from any liability arising as a matter of partnership or bankruptcy law, by reason of guaranty, or otherwise. The general partners will fund the Additional Payments.

Claims for property taxes comprise Class 3. These claims will paid over six years from the date of assessment of such claims, with interest at seven (7%) percent.

The general partnership interests in the Debtor comprise Class 7. The Debtor's Plan allows those general partners who contribute their proportionate share of an aggregate $200,000 new value contribution ("the New Capital Amount") to retain their general partnership interests. The general partnership interests of those general partners that do not contribute their share of the New Capital Amount will be terminated.

The Report of Voting on the Debtor's Plan reflects acceptance by all classes except Class 1. Surprisingly, Lincoln voted its Class 6 claim in favor of acceptance, presumably to be assured to receive the Additional Payment if the Debtor's Plan were confirmed.

Lincoln objected to confirmation of the Debtor's Plan on several grounds. The most prominent of these Objections, which we find alone provide a basis for denying confirmation of the Debtor's Plan, are that the Debtor's Plan improperly permits the Debtor to seize assets that are not property of the estate under the recent decision in *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3rd Cir.1993); and that the Debtor's Plan is therefore not feasible. In addition, Lincoln's Objections included the following: (1) the Debtor has improperly valued Lincoln's secured claim in deducting the tax claims from the agreed $6.6 million Property valuation figure; (2) the interest rate to be paid by the Debtor is insufficient in light of the recent decision on *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3rd Cir.1993); and (3) the Debtor improperly conditioned a release of its partners upon the remittance of the Additional Payments. Assuming *arguendo* that the latter argument were accepted, Lincoln argued that its ballot

accepting the Plan as to Class 6 could be deemed changed to a rejection. The consequent rejection of the Plan by Class 6 allowed it to argue that the Debtor's Plan violated the absolute priority rule.

Lincoln's Plan is, not surprisingly, a liquidating plan. It divides Lincoln's claim into a secured claim of $6,600,000 and an unsecured claim of $2,987,988.40. Lincoln's secured claim is the only claim in Class 1. On account of this claim, Lincoln will receive (1) the Property; (2) the Debtor's assets (including but not limited to all of the Debtor's cash, property, equipment, vehicles, bank accounts, rents, revenues, and causes of action); (3) the funds in the Suspense Account; and (4) the adequate protection payments.

The claims of general unsecured creditors comprise Class 5. Lincoln's Plan specifically includes the unsecured portion of its claim and the Hansens' claim in Class 5. Lincoln intends to pay twenty-five (25%) percent of the general unsecured claims on the effective date or thirty (30) days after the claims are allowed, if allowed after the effective date.

Claims arising from taxes comprise Class 2. These claims will be paid in full on the effective date or thirty (30) days after the claims are allowed, if allowed after the effective date.

The general partnership interests and any claims the general partners have against the Debtor comprise Class 6. ˙Lincoln's Plan provides that all of the general partners' claims and interests for monies invested, loaned and/or advanced prior to the Petition Date are deemed equity capital. The general partners are given no distribution on account of such claims or interests.

The Debtor objects to Lincoln's Plan on the following several grounds: (1) it improperly bifurcates Lincoln's claim and gerrymanders it into two classes in order to obtain the vote of an impaired class; (2) it improperly values Lincoln's secured claim; (3) it improperly designates Class 1 as impaired; (4) it is impossible for Lincoln to obtain the vote of an impaired class in its support and, therefore, it cannot satisfy 11 U.S.C. § 1129(a)(10); (5) it fails the "best interests of the creditors test" contained in 11 U.S.C.

§ 1129(a)(7) because the creditors would receive more in a Chapter 7 liquidation than under Lincoln's Plan; (6) it fails to properly classify the Hansens' claim and deprives the Hansens of their § 1111(b) election; (7) it improperly classifies and treats the general partners' unsecured claims for loans as equity; (8) it is not confirmable under 11 U.S.C. §§ 1129(b)(2)(A), (B), or (C); and (9) it improperly transfers the Debtor's assets to Lincoln.

As we noted at the outset, *see* page 761 *supra*, we conclude that neither Plan can be confirmed. Since the deficiencies that we find in the Debtor's Plan relate to its use of the rents and probably are incurable, we will discuss these issues first. We also briefly note that the other Objections lack merit. With respect to Lincoln's Plan, we find that it cannot be confirmed on the rather technical grounds that the Plan improperly provides Lincoln with an unsecured deficiency claim and that it overvalues Lincoln's secured claim. Since we believe that Lincoln can readily amend its plan and present a confirmable plan, we will address each of the Debtor's objections to Lincoln's Plan in more detail than the unsuccessful Objections of Lincoln to the Debtor's Plan.

## C. DISCUSSION

1. *THE DEBTOR'S PLAN IS NOT CONFIRMABLE BECAUSE IT UTILIZES RENTS WHICH THE MOUNTAIN VIEW CASE HOLDS ARE LINCOLN'S PROPERTY.*

Both of Lincoln's successful Objections to confirmation of the Debtor's Plan arise from application of *Mountain View, supra*. In that case, the mortgage at issue contained an assignment of rents clause. *Id.*, 5 F.3d at 36. After the debtor defaulted, the mortgagee exercised its rights under its assignment of rents clause and notified the tenants that all future rents should be paid to the mortgagee. *Id.* Since the notice was given more than 90 days before the debtor filed its bankruptcy petition, the debtor had no prospect of arguing that the actions of the mortgagee in taking the assignment of the rents were avoidable as a preference. *Id.* at 38.

The court addressed the issue of whether the mortgagee held title to, or merely a security interest in, the rents. It held that, since Pennsylvania is a "title state," "[t]he rents are not property of the debtor's estate and are not available for use in a plan of reorganization." *Id.* at 38.

Like the mortgagee in *Mountain View*, Lincoln enforced its rights under the Assignment of Rents and notified all tenants in the Property to pay their rent directly to Lincoln prior to the Petition Date. Thus, the rents belong to Lincoln, not the Debtor, and they cannot be used in the Debtor's Plan.

■ The Debtor argues that the conclusions reached as to the parties' rights to rents of *Mountain View* are not applicable to this case because (1) Lincoln consented to the use of cash collateral, while the mortgagee in *Mountain View* did not give any such consent; (2) Lincoln served notice to the tenants to the payments to it *within* the 90–day period before the bankruptcy case was filed, while, in *Mountain View*, the notice was served more than 90 days before the case was filed; and (3) Lincoln only had constructive possession of the Property, while, in *Mountain View*, the mortgagee took actual possession of the property.

We do not believe that *Mountain View* is distinguishable from the instant case, as the facts now stand. As noted at page 762 *supra*, Lincoln's consent to the Debtor's use of cash collateral expired by its own terms on August 5, 1993. We perceive nothing in the reasoning of *Mountain View* to suggest the fact that the mortgagee took actual possession of the property impacted on the court's result. *Compare In re Wynnewood House Associates,* 121 B.R. 716, 721–23 (Bankr. E.D.Pa.1990) (a mortgagee obtains constructive possession of rents upon making a demand for payment of same upon the tenants).

■ The significance of Lincoln's sending the crucial demand notice to tenants within the 90–day preference period is likewise of no present consequence. The fact that a creditor's action is voidable as a preference does not render that action void or otherwise invalid prior to a court's determination that the transfer is in fact avoided.

*See In re Kaplan, First Options of Chicago, Inc. v. Kaplan,* Bankr. No. 93–10625S, Adv. No. 93–0507S, slip op. at 62–63, n. 6, 1993 WL 437598 (Bankr.E.D.Pa. Oct. 26, 1993); and *In re Taylor,* 96 B.R. 584, 590 (Bankr. E.D.Pa.1989).

■ Furthermore, there is some question in our mind as to whether Lincoln's act of making a demand for payment of rents is avoidable as a preference. To succeed in voiding this action, all of the prerequisites of 11 U.S.C. § 547(b) would have to be proven by the Debtor, not only the 90–day requirement set forth in 11 U.S.C. § 547(b)(4)(A). We have a particular question regarding the presence of the element required by 11 U.S.C. § 547(b)(5), since the *Mountain View* court states that a mortgagee's lien on rents "attaches and is perfected, for Bankruptcy Code purposes, at the moment of execution, delivery and recordation of the instrument [of assignment]." 5 F.3d at 39. Actions taken by secured creditors in the preference period are generally not avoidable in light of 11 U.S.C. § 547(b)(5). *See In re Lease–A–Fleet, Inc.,* 152 B.R. 431, 438 (Bankr.E.D.Pa. 1993); and *In re Rimmer Corp.,* 80 B.R. 337, 339 (Bankr.E.D.Pa.1987).

In addition, we have not explored the potential defenses that Lincoln might have under 11 U.S.C. § 547(c). It would therefore be presumptuous for us to conclude that the Debtor could avoid Lincoln's ownership interest in the rents of the Property at this juncture. Consequently, we have no choice except to conclude that the rents are Lincoln's property, and cannot be used by the Debtor at this time.

■ The Debtor's Plan provides that all funds in the Suspense Account less the amounts due to Lincoln as adequate protection payments and for payment of certain expenses "shall be turned over to the Debtor to first pay the 1993 school taxes and the balance to fund distributions under [the Debtor's Plan] and the operations of the Property." Since the Suspense Account consists of rents from the Property collectible after the date of Lincoln's notice to the tenants, those rents belong to Lincoln and the Debtor cannot use them to fund its Plan. By

providing that the entire Suspense Account be turned over to the Debtor, the Debtor's Plan therefore provides for improper seizure of Lincoln's property.

■ The Debtor's argument that Lincoln is estopped from objecting to the turnover of the Suspense Account because it agreed, in the Fourth Cash Collateral Stipulation, that these funds would be turned over upon confirmation of the Debtor's Plan, is also to no avail. This argument fails because (1) the Fourth Cash Collateral Stipulation has expired by its own terms; (2) the plan referred to in that stipulation was the 1st Plan, not the Plan presently at issue; and (3) Lincoln did not waive its right to subsequently argue that it had title to the funds in the Suspense Account.

■ It should be noted that we agree with the Debtor's contention that, if Lincoln had merely a security interest in the funds in the Suspense Account, the Debtor might be able to use that money to fund its plan. *See In re River Village Associates,* 1993 WL 243897, slip op. at *6 (Bankr.E.D.Pa. June 29, 1993) (*"River Village I"*); and *In re Coventry Commons Associates,* 149 B.R. 109, 114 (Bankr.E.D.Mich.1992). However, we also acknowledge that *Mountain View* concludes that a mortgagee who demands rent payments from the tenants pre-petition has an ownership interest, and not merely a security interest, in those rents. 5 F.3d at 39. Also, even though Lincoln has an ownership interest in the rents, we believe that, once the mortgagee's claim is paid in full, the remaining rents belong to the Debtor. Thus, *Mountain View* effectively provides a mortgagee with either an ownership interest in rents which expires when the mortgagee's claim is paid in full or an absolute assignment of the rents for a limited duration. However, that duration has not yet come to a close in the instant factual setting. Therefore, the Debtor cannot make a claim to the rents.

■ Also, in light of *Mountain View,* the Debtor's Plan cannot be confirmed because it is not feasible. We agree with the Debtor that "[t]he standards for determining plan feasibility are not rigorous." *River Village I,*

slip op. at *4. *See also In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 419 (Bankr. E.D.Pa.1991). However, without use of the funds in the Suspense Account and without the ability to use rents from the Property until Lincoln's claim is fully paid, we do not see how the Debtor could possibly retain the funds necessary to make the payments required under its plan.

The Debtor claims that the testimony of Frank, apparently the Debtor's managing general partner, supports the feasibility of its plan and provides the basis for its projections. However, this testimony is based on the assumption that the Debtor has title to, and therefore has a right to receive, the rents from the Property. Thus, this testimony supports our conclusion that, without the use of the rents, the Debtor's Plan is not feasible.

Because the Debtor's Plan requires turnover of the Suspense Account and is not feasible without the Debtor's access to the rents, the Plan cannot be confirmed. Since we have determined that there are two very strong and probably incurable grounds for denying confirmation of the Debtor's Plan, we need not discuss Lincoln's other Objections to the Debtor's Plan in depth. However, we will discuss these issues briefly.

2. *THE REMAINING OBJECTIONS OF LINCOLN TO THE DEBTOR'S PLAN LACK MERIT.*

a. PRE–PETITION TAX LIENS ARE PRIOR TO LINCOLN'S CLAIM

■ The first Objection is the Debtor's argument that Lincoln's secured claim may not be fixed at the previously-agreed value of the Property of $6,600,000 because that figure fails to include the pre-petition tax liens totalling approximately $207,720 levied by Montgomery County, Whitpain Township and the Wissahickon School District. Lincoln responds by arguing that these tax claims do not create liens on the Property and do not have priority over its secured claim. Lincoln's argument has no basis under Pennsylvania law.

■ Pre-petition tax liens must be deducted from the value of the property in

determining a mortgagee's secured claim under 11 U.S.C. § 506(a). *See, e.g., In re 222 Liberty Associates,* 105 B.R. 798, 801–02 (Bankr.E.D.Pa.1989); and cases cited therein. The pertinent state statute, 53 P.S. § 7102, grants all taxes imposed by counties, townships and school districts a first lien on real property. That lien attaches from the date on which the millage or tax rate is fixed except when that date is prior to the commencement of the fiscal year for that tax. 53 P.S. § 7103. The pre-petition tax claims in issue therefore became valid liens on the Property on the date that the millage was determined and the tax was assessed, both of which occurred before the Petition Date as to each of the taxes in issue. Since these pre-petition liens must be deducted from the value of the Property, Lincoln's secured claim is overvalued by at least $207,720. Although it has failed to account for a possible slight increase in value due to the presence of the U.S. Health lease, we find that the Debtor is basically correct in its calculations of Lincoln's secured claim.

### b. THE DEBTOR'S DEFERRED INTEREST RATE

■ Second, we believe that the Debtor's proposed deferred interest rate of nine and one-eighths (9⅛%) percent is appropriate and is not inconsistent with *Jones, supra.* After a lengthy discussion of this issue in *River Village II, supra,* 161 B.R. at 135–40, we concluded that the comparably-situated debtor in that case could properly fix the interest rate to be paid to its mortgagee on account of its plan at nine (9%) percent. The interest rate proposed here is, of course, slightly higher than that figure.

### c. RELEASES OF NON–DEBTORS

■ Finally, there is nothing improper or violative of 11 U.S.C. § 524(e) in plan provisions that allow creditors the option of agreeing to release non-debtor third parties on certain conditions, as long as those Plan provisions bind only those parties affirmatively agreeing to the releases. *See In re St. Mary Hospital,* 155 B.R. 345, 350 (Bankr. E.D.Pa.), *stay denied,* 157 B.R. 235 (E.D.Pa. 1993); *In re Swedeland Rd. Corp.,* 1992 WL

111112, slip op. at *2 (Bankr.E.D.Pa.1992); and *In re Monroe Well Service, Inc.,* 80 B.R. 324, 334–36 (Bankr.E.D.Pa.1987). As a result, we conclude that Lincoln's ballot accepting the Plan as to Class 6 cannot be invalidated, as that class, including the release option, has been properly conceived. Consequently, we find that Lincoln's convoluted arguments that the absolute priority rule was violated are irrelevant and need not be addressed.

Therefore, were it not for the impasse created by *Mountain View,* the Debtor's Plan might well be confirmable. We will now consider the confirmability of Lincoln's Plan.

### 3. *LINCOLN'S PLAN CANNOT BE CONFIRMED BECAUSE (1) LINCOLN CANNOT ASSERT AN UNSECURED CLAIM UNDER THE TERMS OF ITS PLAN, AND STILL VOTE IN CLASS 5; AND (2) IT HAS IMPROPERLY VALUED ITS OWN SECURED CLAIM.*

### a. PROVISION OF AN UNSECURED CLAIM TO LINCOLN

■ The Debtor claims that Lincoln's Plan improperly provides Lincoln itself with an unsecured claim. The Debtor argues that, since the Plan also provides for the transfer of the Property to Lincoln, Lincoln is not entitled to a nonrecourse claim under 11 U.S.C. § 1111(b). Section 1111(b)(1)(A)(ii) provides, in relevant part, as follows:

> [a] claim secured by a lien on a property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—
>
> .    .    .    .    .
>
> (ii) *such holder does not have such recourse and such property is sold under section 363 of this title or is sold under the plan* (emphasis added).

■ Section 1111(b) deals with the rights of creditors in a Chapter 11 case whose claims are partially secured by property of

the bankruptcy estate. *In re 222 Liberty Associates*, 108 B.R. 971, 977 (Bankr.E.D.Pa. 1990). Subject to certain exceptions, § 1111(b) sets forth the general rule that such claims are treated as recourse claims, regardless of whether the claimant had recourse against the debtor under its contract or applicable state law. *Id.* As is noted in *In re Tampa Bay Associates, Ltd.*, 864 F.2d 47, 49 (5th Cir.1989), Congress enacted this Code section to preclude recurrence of the result perceived harsh to the secured creditors involved in *Great National Life Ins. Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr.N.D.Ga.1976).

*Pine Gate* was decided under Chapter XII of the former Bankruptcy Act. The debtor in that case was a limited partnership whose sole asset was an apartment project, which was financed on a non-recourse basis. The debtor proposed a plan that limited the lenders' secured claims to the appraised value of the property, which was less than the outstanding indebtedness. The plan did not provide these lenders with an unsecured deficiency claim and, therefore, the lenders could not participate or vote in the class of unsecured creditors. At the confirmation hearing, the lenders argued that the benefit of the bargain they negotiated for in providing non-recourse financing was either full payment or the right to foreclose on the property. They stated that their rights would not be adequately protected unless they were paid in full or allowed to foreclose. The bankruptcy court rejected the lenders' arguments and held that the proposed treatment of the secured claims, through a cash payments equal to the property's appraised value, was sufficient.

Following *Pine Gate*, a debtor whose property had declined in value could cram down a plan on a lender who was undersecured and pay that lender only the appraised value of the property. *Tampa Bay, supra*, 864 F.2d at 50; and *In re DRW Property Co. 82*, 57 B.R. 987, 990 (Bankr.N.D.Tex.1986). Thus, the debtor could retain all of the property's future appreciation for itself. *Id.* Further, the lender did not receive the benefit of its bargain, *i.e.*, the lender did not receive full payment of its debt or possession of the property. *DRW, supra*, 57 B.R. at 990.

Congress enacted § 1111(b) in response to the situation presented in *Pine Gate*. This section was intended to enable a debtor to retain encumbered property that is essential to its reorganization and preserve the unsecured non-recourse creditor's benefit of the bargain. *Tampa Bay, supra*, 864 F.2d at 50. Congress protected both parties' interests by providing undersecured creditors with an opportunity to elect to have their liens treated as recourse claims if the debtor retained the property. *Id.*

> Section 1111(b) represents an attempt by Congress to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment. On the one hand, section 1111(b), taken in conjunction with sections 1124 and 1129, gives the debtor the power to retain encumbered property essential to the debtor's reorganization and to obtain confirmation of its plan in the face of opposition by a class of creditors whose claims are secured by such property. This preserves the debtor's ability to reorganize. On the other hand, sections 1111(b), 1124 and 1129 permit the secured lender to protect itself so as to insure reasonable treatment under a plan. Thus, section 1111(b) protects the legitimate expectation of the secured lender that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors.

5 COLLIER ON BANKRUPTCY, § 1111.02, at 1111–18 (15th ed. 1993).

Section 1111(b)(1)(A)(ii) further explicitly provides that a non-recourse creditor whose secured property is sold pursuant to 11 U.S.C. § 363 or a plan of reorganization is not entitled to the special protection afforded by § 1111(b), *i.e.*, such creditors are not entitled to an unsecured deficiency claim. Thus, § 1111(b) only protects non-recourse undersecured creditors (1) that are not permitted to purchase the collateral at a sale; or (2) if the debtor intends to retain the property after bankruptcy and not repay the debt in full. *Tampa Bay, supra*, 864 F.2d at 50.

It is clear that an undersecured non-recourse creditor is deprived of its § 1111(b) deficiency claim when there is a sale of the property. 11 U.S.C. § 1111(b)(1)(A)(ii). Lincoln responds to this argument by claiming that the instant case does not involve a sale of the Property, but instead involves a transfer. Thus, we must determine whether Lincoln, a non-recourse creditor, is deprived of its § 1111(b) deficiency claim when the property securing its claim is transferred rather than sold pursuant to a plan. *Cf. DRW, supra,* 57 B.R. at 993 (Congress' failure to include abandonments, foreclosures, and transfers of property in the exception to 1111(b) appears to be an unintentional omission rather than an expression of Congressional intent).

The *Tampa Bay* court also addressed the issue of whether an undersecured, non-recourse creditor that foreclosed on the property securing its claim was entitled to an unsecured deficiency claim under § 1111(b). The court reasoned that

> [f]oreclosure is similar to a section 363 sale in that the creditor in each instance is allowed the opportunity to preserve the benefit of its bargain with the debtor by purchasing its collateral at a sale.... With this protection, the nonrecourse secured lender does not need the statutory protection of section 1111(b).

864 F.2d at 50. Since the occurrence of a foreclosure was held to enable the creditor to receive the benefit of its bargain, the court held that creditor was not entitled to a deficiency claim under § 1111(b).

Other courts addressing the same or similar issues have reached the same result. *See In re 680 Fifth Avenue Associates,* 156 B.R. 726, 730 (Bankr.E.D.N.Y.1993); *In re Mesa Business Park Partnership,* 127 B.R. 144, 148–49 (Bankr.W.D.Tex.1991); *In re National Real Estate Limited Partnership–II,* 104 B.R. 968, 973–75 (Bankr.E.D.Wis.1989) (a non-recourse creditor that foreclosed on a property securing its claim was not entitled to a deficiency claim under § 1111(b)); and *DRW, supra,* 57 B.R. at 991 (if a property securing a claim is abandoned or foreclosed during Chapter 11 case, a non-recourse creditor is not entitled to deficiency claim).

Faced with the same issue involved in this case, the court in *In re Western Real Estate Fund, Inc.,* 109 B.R. 455, 464–66 (Bankr. W.D.Okl.1990), held that a transfer of property under the plan before the court deprived the non-recourse creditor of a § 1111(b) unsecured deficiency claim.

In the instant case, the transfer of Property to Lincoln provides Lincoln with the benefit of its bargain. That is, when becoming a non-recourse creditor, Lincoln agreed to accept the Property or payment in full. Like the creditors in the cases cited above, since Lincoln is getting the Property, it is not entitled to an unsecured deficiency claim under § 1111(b) in addition. Thus, Lincoln's Plan improperly provides it with an unsecured claim and, therefore, it cannot vote in Class 5. Its plan allowing it to do so cannot be confirmed.

### b. VALUATION OF LINCOLN'S SECURED CLAIM

We have already pointed out, in our discussion of Lincoln's Objections to the Debtor's Plan, at pages 767–68 *supra,* that Lincoln improperly valued its own secured claim at $6,600,000, because it failed to deduct therefrom pre-petition tax liens against the Property totalling about $207,720. The increase in value from the U.S. Healthcare lease is unlikely to offset this over-valuing of its secured claim. Therefore Lincoln's Plan also cannot be confirmed because Lincoln's claim is over-valued in the Plan.

### 4. THE REMAINDER OF THE DEBTOR'S OBJECTIONS TO LINCOLN'S PLAN LACK MERIT.

### a. IMPAIRMENT OF LINCOLN'S CLAIM

The Debtor has raised numerous other objections to Lincoln's Plan, as noted at page 765 *supra.* However, we conclude that none of these objections have merit. First, we discuss the Debtor's contention that Lincoln's secured claim is not impaired because, in addition to the Property, Lincoln is receiving the following assets on account of its secured claim under the terms of its Plan: (1) the debtor-in-possession cash: (2) the

funds in the Suspense Account; (3) the adequate protection payments; (4) relief from payment of transfer tax; and (5) recovery from any alleged causes of action.

The Debtor's assertion that these incidents of Lincoln's Plan render Lincoln's secured claim unimpaired is without merit. The Code provision which governs impairment of claims and interests in this instance is 11 U.S.C. §§ 1124(1), (3) which provide, in relevant part, that

> a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> > (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; ...
> >
> > ...; or
> >
> > (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to ... the allowed amount of such claim....

■ In its Plan, Lincoln's rights are altered and hence impaired. First, as explained at pages 765–67 *supra*, Lincoln is entitled to the funds in the Suspense Account and the debtor-in-possession cash to the extent they result from rents paid after Lincoln gave notice to the tenants that future rents should be paid to it. Second, the Debtor agreed that Lincoln was entitled to adequate protection payments in the Fourth Cash Collateral Stipulation. Thus, it is judicially estopped from now arguing that Lincoln is not entitled to those payments. Third, since the Bankruptcy Code enables Lincoln to avoid payment of any realty transfer tax, 11 U.S.C. § 1146(c), it is not receiving this advantage on account of its claim. Thus, the only thing that Lincoln is receiving under the plan that it is not otherwise entitled to is the alleged causes of action held by the Debtor.

In exchange for this asset, Lincoln is required to pay the accumulated administrative claims and the tax claims associated with its Plan. Were it not for the terms of the Plan, Lincoln would not have been responsible for these amounts. Thus, Lincoln's legal rights are altered and its claim is impaired by the terms of its Plan.

■ Moreover, the result would be the same even if Lincoln's position were enhanced as a result of the plan. In *River Village I, supra,* slip op. at *3; and *In re Temple Zion,* 125 B.R. 910, 917–20 (Bankr. E.D.Pa.1991), we pointed out that "impairment" is a term of art and includes virtually any alteration of a claimant's rights. Impairment therefore occurs even where a creditor's rights are improved by a plan. In *In re L & J Anaheim Associates,* 995 F.2d 940 (9th Cir.1993), the court held that a creditor's rights were deemed impaired for plan confirmation purposes where, as here, the terms of the creditor's own competing plan enhanced its position. Thus, even if Lincoln's position were improved by its Plan, its claim would still be deemed impaired thereby.

■ The Debtor also asserts that Lincoln's secured claim is unimpaired under § 1124(3) because it is receiving the Property and $1,073,953 of cash and money's worth on the effective date. However, in order to be unimpaired under § 1124(3), Lincoln must receive *cash*, not cash and property, on the effective date.

■ Finally, the Debtor asserts that by receiving the Property, Lincoln is receiving the "indubitable equivalent" of its claim and, therefore, it should be deemed unimpaired under § 1124(3). There is no statutory or case law support for this proposition. Thus, we refuse to find that a creditor's claim is unimpaired just because the creditor receives the "indubitable equivalent" of its claim.

The Debtor also alleges that Lincoln's Plan cannot be confirmed under the cram down provisions of 11 U.S.C. § 1129(b)(1) because no impaired class of creditors has accepted the plan. In order to cram down a plan over the objection of creditors, at least one class of claims that is impaired must accept the plan, as determined without including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10).

As explained above, the Debtor correctly states that Lincoln does not have an unsecured claim and its vote in Class 5 cannot be

counted. Further, since all of the other creditors in Class 5 rejected Lincoln's Plan, Class 5, which is impaired, has rejected the plan. Additionally, Class 6 is deemed to have rejected the plan since the interest holders in that class are not receiving any property under the plan. 11 U.S.C. § 1126(g).

However, as explained above, Lincoln's secured claim, which is the only claim in Class 1, is impaired and Lincoln has voted to accept the plan. Thus, there is an impaired class that has accepted Lincoln's Plan.

### b. LINCOLN'S "INSIDER" STATUS

■ The Debtor argues that, since Lincoln is the plan proponent, it is an "insider," pursuant to 11 U.S.C. § 101(31)(C), and its vote cannot be considered in determining whether an impaired class accepted the plan. However, as we explained in *River Village II, supra*, 161 B.R. at 142:

> According to the legislative history, "[a]n insider is one who has a significantly close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.REP. NO. 95–989, 95th Cong., 1st Sess. 25 (1978). In this case, we find that the Debtor and GECC are clearly dealing at arms length, and that therefore their relationship is clearly not sufficiently close to warrant special scrutiny.
>
> We acknowledge that there may be cases where a plan proponent is in insider because it exercises significant influence over the debtor's decisions and becomes deeply involved in its business. *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 297–98 (Bankr.W.D.Pa.1990). However, that is not the case here.

The relationship between the successful creditor/plan proponent, General Electric Credit Corp. ("GECC"), and the debtor in *River Village* was exactly the same as the relationship between the Debtor and Lincoln in this case. These parties are clearly dealing at arms length with each other and they do not have a significantly close relationship which could subject their conduct to particular scrutiny. Thus, Lincoln is not an insider

and its vote can be counted in determining whether there is an impaired accepting class.

### c. 11 U.S.C. § 1129(a)(7)

■ The Debtor also argues that Lincoln's Plan does not provide creditors with the amount that they would have received in a Chapter 7 liquidation and, for that reason, the Plan cannot be confirmed under 11 U.S.C. § 1129(a)(7)(A). This Bankruptcy Code section requires that any creditor who rejects a plan must receive or retain under the plan an amount equal to the amount that it would receive in a Chapter 7 liquidation. The Debtor claims that, according to its liquidation analysis, unsecured creditors would be paid in full in a Chapter 7 liquidation, and Lincoln's Plan would only pay these creditors twenty-five (25%) percent of their claims.

The Debtor's liquidation analysis is flawed in two key respects. First, it is based on the assumption that all of the debtor-in-possession's cash belongs to the Debtor's estate. However, as explained above, in a Chapter 7 liquidation, these funds would belong to Lincoln, pursuant to the holding in *Mountain View*, to the extent that they constituted rents collected after Lincoln's notification to the tenants.

Second, the Debtor assumes that the Chapter 11 administrative fees would be no more than $10,000 because any fees chargeable by its counsel in excess of that amount would be charged against the Property pursuant to 11 U.S.C. § 506(c). However, in this case, we do not believe that the Debtor's counsel would be successful for a very large amount, if any, in a § 506(c) claim against Lincoln, as it appears that very few of these services benefitted Lincoln. *See In re Orfa Corp. of Philadelphia*, 149 B.R. 790, 798–800 (Bankr.E.D.Pa.1993); and *In re Cann & Saul Steel Co.*, 86 B.R. 413, 417–19 (Bankr. E.D.Pa.1988). Thus, the Chapter 11 administrative fees should have been included as chargeable against its estate in the Debtor's liquidation analysis. Considering the Debtor's liquidation analysis in light of the foregoing, we conclude that the unsecured creditors would not receive any return in a Chapter 7 liquidation. Accordingly, Lincoln's Plan satisfies the best interest of the creditors test.

#### d. TREATMENT OF THE HANSENS' CLAIM

██ The Debtor next argues that it is improper to classify the Hansens' claim in Class 5, with the claims of the general unsecured creditors, because the Hansens have a valid second mortgage on the Property. The Debtor claims that Lincoln is gerrymandering to insure that Hansen will be in a class of unsecured creditors that is controlled by Lincoln through its large unsecured deficiency claim. The Debtor also contends that, since the Hansens' claim has not been placed in a class of its own, the Hansens have been denied the right to elect treatment under 11 U.S.C. § 1111(b).

If the Hansens' claim is in any respect a deficiency claim, Lincoln could not only choose, but also would be obliged, to include it in the same class as the general unsecured creditors. *See John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 159–61 (3rd Cir. 1993); and *FGH Realty Credit Corp. v. Newark Airport/Hotel Limited Partnership,* 155 B.R. 93, 99 (D.N.J.1993). Additionally, if the Hansens' claim is unsecured, they would not have a right to elect treatment under 11 U.S.C. § 1111(b) because such a right is not available if the creditor's security interest in the property is of only inconsequential value. 11 U.S.C. § 1111(b)(1)(B). *See also 222 Liberty Associates II, supra,* 108 B.R. at 977–78. *Cf. In re Plouffe,* 157 B.R. 198, 200 (Bankr. D.Conn.1993) (totally undersecured claim may be treated as an unsecured claim and its secured status may be avoided in a Chapter 13 case despite the holding of *Nobelman v. American Savings Bank,* —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993)). Thus, the question of whether or not the Hansens' claim is properly classified turns on the issue of whether the Hansens' claim is, in actuality, totally unsecured.

In the Fourth Cash Collateral Stipulation, the Debtor and Lincoln agreed that, as of May 1, 1993, the Property's fair market value was $6,600,000. If this value is correct, the claim of Lincoln, which is prior to that of the Hansens, is itself partially undersecured, and the Hansens' junior claim must be deemed completely unsecured. However, in order to determine whether the Hansens' claim is unsecured for purposes of ruling on classification, we must determine whether the Hansens are bound by the agreed value of the Property in the Fourth Cash Collateral Stipulation, even though they were not parties to the stipulation.

Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 9019(a) governs approval of stipulations. In accordance with that rule, the Hansens were given notice of the Fourth Cash Collateral Stipulation and had an opportunity to object to it. In an analogous situation, we recently determined that

> [t]he very purpose of F.R.B.P. 9019 is to provide creditors and other interested parties with an opportunity to object to stipulations which may unfairly adversely affect their interests. As is stated at 9 *Collier on Bankruptcy,* ¶ 9019.03, at 9019–16 (15th ed. 1993), "[a] compromise effected with the approval of the court is conclusive on the parties *and on the creditors of the estate as well* " (emphasis added).

*In re Lewis,* 157 B.R. 555, 561 (Bankr. E.D.Pa.1993).

Since the Hansens were given notice of the Fourth Cash Collateral Stipulation and they failed to object to it, we find that they are bound by the value of the Property contained therein. Thus, the Hansens' claim is totally undersecured and must be deemed unsecured, and it is properly included in Class 5.

#### e. TREATMENT OF THE CLAIMS OF THE DEBTOR'S PARTNERS

██ The Debtor also alleges that Lincoln's Plan improperly classifies and treats the general partners' claims as equity interests. The Debtor's argument in this respect arises from the fact that Lincoln's Plan placed the general partners' alleged unsecured claims in a class separate from other unsecured claims that receives no payment. *See page 765 supra.* The Debtor argues that this treatment of the partners' claims constitutes unfair discrimination under 11 U.S.C. § 1129(b)(1) and amounts to effecting equitable subordination upon the partners without any proof of the necessary elements for sub-

ordination of their claims under 11 U.S.C. § 510(c).

■■■ At the outset it should be noted that we believe that the issues of equitable subordination of debt and re-characterization of debt as equity capital are different and should be treated separately. *Accord, In re Hyperion Enterprises, Inc.,* 158 B.R. 555, 560 (D.R.I.1993). Section 510(c) of the Bankruptcy Code specifically authorizes a court to equitably subordinate a claim or interest. This authorization "[d]oes not prevent the court from seeing through a purported claim and determining in a particular instance that the claimant in fact took an equity position when he advanced funds to the debtor." 3 COLLIER, *supra,* § 510.05[1], at 510–8. *But see In re Pacific Express, Inc.,* 69 B.R. 112 (9th Cir.BAP 1986).

The *Hyperion* court considered the following factors in deciding whether to categorize a claim as debt or equity: (1) the adequacy of the capital contribution; (2) the ratio of shareholder loans to capital; (3) the amount or degree of shareholder control; (4) the availability of similar loans from outside lenders; and (5) certain other relevant questions, such as (a) whether the ultimate financial failure was caused by under-capitalization; (b) whether the note included payment provisions and a fixed maturity date; (c) whether a note or other debt document was executed; (d) whether advances were used to acquire capital assets; and (e) how the debt was treated in the business records. 158 B.R. at 561.

Applying these factors to the instant case, we find that the general partners' claims arise from contributions to the Debtor's equity, not from loans. If we accept the Debtor's argument that its partners' contributions are loans, there would have been no capital contribution by the parties. They are arguing that all of what ordinarily would be considered as capital contributions are loans. The partners had complete control of the Debtor. Outside loans from both Lincoln and the Hansens were available when most of the partners' contributions were made. The Debtor's 1991 financial statements do not reflect a loan from the general partners. In fact, they appear to include the disputed

funds as part of the partners' deficit. Moreover, the Debtor did not produce any evidence demonstrating that the transactions with the partners at issue were loans. There were no loan agreement or histories of loan payments. There were no promissory notes. Finally, the Debtor's original bankruptcy schedules and statement of financial affairs were signed by Frank, apparently the Debtor's managing general partner, and they did not list any claims due and owing to the general partners.

■■■ We noted, at page 763 *supra,* that the Debtor recently filed a Praecipe to Amend its Schedules to reconstitute the general partners' contributions as undisputed claims. The general rule is that the Debtor may amend its schedules any time before a case is closed. F.R.B.P. 1009(a). However, the court has the discretion to deny leave to amend on a showing of a debtor's bad faith or prejudice to creditors. *In re Shaffer,* 92 B.R. 632, 634 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–9742 (E.D.Pa. April 10, 1989). In this case the amendment was filed after (1) confirmation of the Debtor's 1st Plan was considered and denied; (2) the Debtor's exclusive period to file a plan had terminated; and (3) Lincoln's initial plan, proposing a twenty (20%) percent payment to unsecured creditors, was filed. If the Debtor's position were adopted, the amendment would require Lincoln to pay an additional $543,918.00 upon confirmation of its plan. Creating rights to such substantial payments at this late stage in these proceedings would clearly unfairly prejudice Lincoln.

In support of the Debtor's contention that the contributions should be reclassified, Frank testified that the Debtor's internal financial statements were incorrect, and that the claims arose from loans by the partners to the Debtor. We do not, however, believe that this testimony was credible, and no evidence was produced to support it. Since we must look at the substance of the transaction giving rise to the general partners' claims and have found no credible evidence that the transactions at issue were intended or are legitimately characterized as loans, we find that Lincoln properly characterized the general partners' claims as equity.

### f. 11 U.S.C. § 1129(b)(2)

The Debtor also argues that Lincoln's Plan is not "fair and equitable," as required by 11 U.S.C. § 1129(b)(2)(A) because, with respect to the Hansens' claim, it does not allow the Hansens to retain their lien and it does not provide that they will receive deferred cash payments equal to the value of their claim or realize the indubitable equivalent of their claim. The Debtor's argument is without merit because § 1129(b)(2)(A) applies only to secured claims and, as explained above, the Hansens' claim is unsecured.

The Debtor also argues that Lincoln's Plan is not "fair and equitable" because it enables Lincoln to receive, in addition to the Property, the Suspense Account, debtor in possession account, adequate protection payments, circumvention of transfer taxes, and the causes of action that belong to the Debtor. As we explained at page 771 *supra*, the only one of these assets that Lincoln is not otherwise entitled to or in which it does not have a security interest is the Debtor's causes of action. This fact, however, does not prevent confirmation of the plan because Lincoln is entitled to receive the actions in consideration for the payments it is required to make under its plan.

The Debtor alleges that Lincoln's Plan violates 11 U.S.C. § 1129(b)(2)(B) because it excludes the Debtor's general partners from sharing in the distribution to the general unsecured creditors and is discriminatory. This argument is without merit because, as explained at pages 773–75 *supra*, the general partners are not unsecured creditors and have no right to the share in the distribution given to such creditors.

The Debtor further argues that Lincoln's Plan also does not meet the requirements of 11 U.S.C. § 1129(b)(2)(C), which states that, in order for a plan to be "fair and equitable" with respect to a class of interests, it must provide that each holder of an interest receive or retain, on account of the interest property of a value, as of the effective date, an amount equal to the greater of (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; and (2) any fixed redemption price to which such holder is entitled or the value of such interest. Alternatively, the holder of any interest that is junior to the interest of such holder may not receive or retain any property under the plan on account of such junior interest.

Lincoln's Plan does not violate § 1129(b)(2)(C) even though the general partners are not receiving any distribution. There is no applicable fixed liquidation preference or fixed redemption price of the Property. The general partners' equity interests in the Debtor and the Property are worthless. Furthermore, there are no holders of any interests junior to the general partners. Thus, Lincoln's Plan does not violate § 1129(b)(2)(C).

### g. IMPROPER TRANSFER OF ASSETS

Finally, as it noted at page 771 and 775 *supra*, in other contexts, the Debtor contends that Lincoln's Plan improperly transfers, to Lincoln, the Debtor's assets, *i.e.*, its debtor in possession cash, the Suspense Account, the transfer tax savings, the adequate protection payments, and the causes of action. However, we found in the discussions at those pages, Lincoln has a right to these assets, either because it is legally entitled to them or as consideration for the payments it is required to make under its plan.

Therefore, except for the deficiencies which this court enumerated at pages 768–70 *supra*, the Debtor's objections to confirmation of Lincoln's Plan have no merit.

### D. CONCLUSION

In contrast to the result of *River Village II*, 161 B.R. at 128–29, 142–43, where we found that both the debtor's plan and a competing plan of the debtor's secured creditor were confirmable, this court is unable to confirm *either* the Debtor's Plan *or* Lincoln's Plan, for the reasons enumerated herein, in this case. However, it appears that, in light of the following rulings, at least Lincoln is capable of presenting a confirmable plan which will correct the deficiencies recited. We will therefore give both parties another opportunity to prepare a confirmable plan. *See River Village I*, slip op. at *3; and *In re*

*641 Associates, Ltd.,* 140 B.R. 619, 633 (Bankr.E.D.Pa.1992). *But see River Village II, supra,* 161 B.R. at 143 (this court does not favor allowing parties to have multiple opportunities to produce a confirmable plan). Lincoln's cause would, of course, be better served *if it were more generous to other interested parties. Compare Id.,* at 131–32 (mortgagee proposed full payment to unsecured creditors and $50,000 pot to the debtor's investors).

In light of Lincoln's proximity to the doorstep of confirmation of a plan proposed by it, we presume that it has withdrawn its Stay Motion and that matter will not be relisted.

### ORDER

AND NOW, this 1st day of November, 1993, after a consolidated hearing of September 9, 1993, to consider whether this court should confirm the Second Amended Plan of Reorganization proposed by the Debtor ("the Debtor's Plan") and Objections of Lincoln National Life Insurance Co. ("Lincoln") thereto; or whether it should confirm the Amended Plan of Reorganization proposed by Lincoln and Objections of the Debtor thereto, into which we incorporated the record of a prior hearing of July 29, 1993, at which we considered confirmation of the Debtor's First Amended Plan, it is hereby ORDERED AND DECREED as follows:

1. Confirmation of the Debtor's Plan is DENIED for reasons set forth in the within Opinion.

2. Confirmation of Lincoln's Plan is also DENIED for reasons set forth in the within Opinion.

3. Any interested party wishing to file a plan or an amended plan consistent with the within Opinion shall file same, with an accompanying Disclosure Statement or supplement to a prior Disclosure Statement, describing the changes from the prior Plan; shall serve black-lined copies of same upon counsel appearing on the attached Mailing List and the court in chambers; and shall notify all interested parties of the filing of the Disclosure Statement or Supplement thereto, on or before November 12, 1993.

3. A hearing on the adequacies of any Disclosure Statements or Supplements filed is scheduled on

WEDNESDAY, DECEMBER 8, 1993, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

4. If no plan or amended plan is filed and served as directed herein, this case will be converted to a Chapter 7 case without any further notice or hearing.