**In re CHURCHILL NUT COMPANY, Debtor.**

**John Richardson, not individually but as Chapter 7 Trustee, Plaintiff,**

**v.**

**Wells Fargo Bank, et al., Defendants.**

**Bankruptcy No. 99–50671. Adversary No. 99–5389.**

United States Bankruptcy Court, N.D. California.

July 26, 2000.

144

Craig Stuppi, Sarah M. Stuppi, Stuppi &
Stuppi, Long Beach, California, for Boeger
Family Farms.

Michelle Rubin, Law Offices of Michelle K. Rubin, Santa Cruz, California, for trustee John Richardson.

Thomas R. Duffy, Duffy & Guenther, Monterey, California, for Roy and Rita Lompa, Harlan and Mary Ann Winkle and R.C. Perry.

Frederick D. Holden, Brobeck, Phleger & Harrison, San Francisco, California, for Wells Fargo Bank.

### Opinion

MARILYN MORGAN, Bankruptcy Judge.

### INTRODUCTION

This matter comes before the Court on the motion of Boeger Family Farms ("Boeger") for summary judgment. The underlying complaint was brought by the Trustee to determine the validity, extent and priority of liens against proceeds from the sale of Churchill Nut's walnut inventory. Boeger seeks a finding that it holds a superior interest in the sales proceeds, while the Trustee contends that Boeger shares pro rata with over 100 walnut growers. The Court concludes that Boeger's prepetition exercise of its state law remedies did not terminate the producer's liens of the other unsubordinated growers, and denies the motion for summary judgment.

### BACKGROUND

Churchill Nut Company was a walnut, almond and cherry processor in Hollister, California. It purchased raw products from growers, processed them, and then packaged the products for sale. When the walnut industry suffered a decline in late 1997 and early 1998, Churchill Nut's business suffered as well. According to its Statement of Financial Affairs, Churchill Nut's gross income dropped from over $9 million in the 12 month period ending August 31, 1997 to $6.5 million for the following year.

While Churchill Nut was struggling with its financial difficulties in 1997 and 1998, it continued to accept nuts from growers for processing. Meanwhile, Wells Fargo Bank, Churchill Nut's secured lender, grew concerned about its outstanding loans. Wells Fargo required that Churchill Nut obtain subordination agreements from its growers, subordinating the growers' first priority producer's liens to the bank's loan. Certain walnut growers who delivered their 1997 walnut crop to Churchill Nut for processing did enter into those agreements. Other producers, known here as the "unsubordinated growers," did not agree.

In the fall of 1997, pursuant to a series of purchase contracts, Boeger delivered more than 236 tons of walnuts to Churchill Nut. This was its entire walnut crop for the year. The parties have stipulated that the walnuts had a value of $380,568, but to date Boeger has received only $21,000 from Churchill Nut on account of that crop.

Having received very little payment, in April 1998 Boeger filed a state court complaint against Churchill Nut for damages and to foreclose upon its producer's lien. Following a trial, a judgment totaling $421,298.73 was entered in favor of Boeger on October 21, 1998. A writ of execution was issued and on November 6, 1998, the Sheriff of San Benito County levied on the writ by seizing approximately 166 tons of shelled walnuts.

Meanwhile, Churchill Nut's business operations continued to fare poorly. Its income was just over $1.5 million for the five month period commencing September 1, 1998. The loans from Wells Fargo came due in 1998, which the bank refused to renew. Wells Fargo pressed for a repayment plan for its outstanding loan portfolio, and asserted a third party claim on the walnuts held by the Sheriff of San Benito County. Once Wells Fargo agreed to dismiss its third party claim, the Sheriff's sale was rescheduled for February 3, 1999. The sale never occurred, however, because on January 29, 1999, Churchill Nut filed for

protection under Chapter 11 of the Bankruptcy Code. The commencement of the bankruptcy case automatically stayed the Sheriff's sale.

On February 3, 1999, following a hearing on an emergency motion filed by Churchill Nut and with no opposition from other parties in interest, this Court entered an order pursuant to 11 U.S.C. § 543(b)(1) directing "[t]hat the Sheriff of San Benito County be, and hereby is, ordered and directed to turn over the [w]alnut [i]nventory to Churchill." In the order, the Court found that the walnuts "are the remainder of Churchill's 1997 walnut inventory ... and subject to a claim of lien in favor of Wells Fargo Bank ... and the possible interests of all walnut growers who sold their 1997 walnuts to Churchill and did not subordinate their agricultural liens ... to the lien of the Bank...."

Due to accounting irregularities, Churchill Nut stipulated to the appointment of a Chapter 11 trustee shortly after the bankruptcy filing. The case converted to Chapter 7 within a matter of weeks. The Trustee has now collected a total of $406,114.19 from sales of the 1997 walnut crop. In order to properly distribute the funds, the Trustee seeks a determination of the validity, priority and extent of liens against the proceeds from this crop. In the underlying complaint, the Trustee asserts that the order of priority of the liens on the proceeds are as follows:

a. Wells Fargo has a first priority lien of $64,918.00 based upon the February 12, 1999 interim order entered by this Court approving Churchill Nut's use of cash collateral;

b. The California Walnut Commission has a second priority lien of $45,713.53 based on California Food and Agricultural Code § 77151;

c. The unsubordinated and consignment growers of the 1997 walnut crop have liens and interests in an undetermined amount pursuant to California Food and Agricultural Code § 55645 and

should share pro rata in the remaining proceeds;

d. Wells Fargo holds a fourth priority lien in an undetermined amount based on a security agreement and various financing statements; and,

e. The subordinated growers of the 1997 walnut crop have liens and interests in an undetermined amount pursuant to California Food and Agricultural Code § 55645, which liens are subordinated to Wells Fargo pursuant to agreements with Churchill Nut.

The Trustee acknowledges in the complaint that Boeger has asserted an interest in the proceeds of the walnut sales superior to that of the other unsubordinated growers. Further, the Trustee requests a determination that Boeger is merely a third priority unsubordinated grower which should share pro rata in the proceeds with all other similar growers. The only issue presently before the Court is whether to grant Boeger's motion for summary judgment regarding the priority of its lien. The priority accorded other parties as set forth in the Trustee's complaint is not before the Court, except to the extent those liens are affected by Boeger's position.

## DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate if the moving party shows that no genuine issue of material fact exists and that it is entitled to prevail in the case as a matter of law. Fed.R.Civ.P. 56(c), made applicable by Fed.R.Bankr.P. 7056; *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991) (citation omitted). In ruling on the motion, the court must draw all reasonable inferences from the underlying facts in the responding party's favor. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 599, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. California Farm Product Growers Hold a Statutorily Created Producer's Lien

 The producer's lien law is part of a California statutory scheme created to protect the producers of farm product. Cal.Agric.Code §§ 55631–55653 (West 2000). According to the Ninth Circuit's most recent published discussion of the subject,

> California law provides that a producer or grower shall have a lien upon 'the product' that it sells to a processing company. The lien attaches to the product upon its delivery to the processor and extends to 'all processed or manufactured forms' of the product. It attaches to the extent of the agreed price or, if there is no agreed price, to the extent of the value of the product on the delivery date.

*Alvernaz Farms, Inc. v. Bank of California (In re T.H. Richards Processing Co.),* 910 F.2d 639, 643 (9th Cir.1990) (citations omitted). The circuit court called the producer's lien "central to an extensive California statutory scheme giving farm product producers a lien on all farm products they sell." *Saslow v. Andrew (In re Loretto Winery Ltd.),* 898 F.2d 715, 720 (9th Cir.1990) (citation omitted).

 *Loretto Winery* addresses the minimal requirements the statute places upon farm product producers and the broad reach of the lien:

> There are no formal requirements to perfect the lien, such as recording or filing. The lien attaches to all of the product, raw or in its processed forms, regardless of segregation, as long as they remain in the processor's possession. The lien is preferred and is 'prior in dignity to all other liens, claims, or encumbrances' except wage and salary claims for services rendered to the processor after the product's delivery and warehousers' liens.

*Id.* at 722 (citations and footnote omitted). In fact, if a processor takes any action to defeat a producer's lien, it is subject to criminal penalties. "These [criminal] provisions fairly shout that California intends to protect producers' liens from defeat." *Id.* Finally, the producer's lien provisions are liberally construed, since "[t]he sense underlying the statutory scheme is that other creditors should not be allowed to benefit from the pockets of laborers and suppliers who have increased the estate's value or, indeed, have created it." *Id.* at 721 (citations omitted).

## C. The Levy By the Sheriff of San Benito County Resulted in a Transfer of Possession

 The producer's lien applies to "every farm product and any processed form of the farm product which is *in the possession* of the processor ...". Cal.Agric.Code § 55634 (emphasis added). "[T]he lien lives or dies based on possession." *Loretto Winery,* 898 F.2d at 721. Since possession is critical, Boeger has hung its summary judgment argument by that hook.

The thrust of Boeger's argument is that when a processor loses possession, growers lose their producer's liens. In the instant case, the Sheriff of San Benito County levied on and took possession of the 1997 walnuts. At the time of the bankruptcy filing, the Sheriff still held the walnuts, as the scheduled sale never took place. Boeger concludes that as a result of the levy, the Sheriff, rather than Churchill Nut, had actual possession of the walnuts. Boeger, as the judgment creditor for whose benefit the levy was executed, had constructive possession. Boeger argues that since Churchill Nut no longer had possession, the walnuts had moved beyond the reach of the producer's lien asserted by the other unsubordinated growers. Boeger bases its conclusion on language found in a case from the California Court of Appeals:

> When the writ has been regularly issued and executed, money collected, while in the hands of the officer, *is property of the judgment creditor and not the debtor.* Nothing can be done with it

other than to turn it over to the creditor. The possession of the officer solely for the use and benefit of the creditor is possession by the latter. As between the parties, the money should be deemed to have been delivered to the creditor immediately upon its receipt by the officer and his right to receive it is not affected by any delay that may occur.

*Del Riccio v. Superior Court of California*, 115 Cal.App.2d 29, 251 P.2d 678, 679 (1952) (emphasis added). *See also U.S. Bank, N.A. v. Deseret Farms of California, Inc. (In re Sargent Walnut Ranches, Inc.)*, 219 B.R. 880, 884 (Bankr.E.D.Cal.1998) (in deciding that the producer's lien does not attach to the proceeds of sale from farm products, the court emphasized that the statute "makes the producer's lien dependent on the processor's possession of the farm product").

### D. The Sheriff's Levy Was a Preferential Transfer

■ The fatal flaw in Boeger's argument is that if the Sheriff's levy resulted in Churchill Nut losing possession of the walnuts, then there was a transfer of an interest of the debtor. Transfers that occur during the 90 days prior to bankruptcy, even involuntary transfers, trigger the protections of the preferential transfer statute, which broadly allows a trustee to "avoid any transfer of an interest of the debtor in property." 11 U.S.C. § 547(b). The Bankruptcy Code defines transfers as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). The preference section as originally drafted only allowed the trustee to avoid transfers "of property of the debtor," but the 1984 Amendments changed that language to the present phrase. "This change is very significant, as it provides a broader definition of the sort of property which can be the

proper subject of an avoidance action . . .". *Kannry & Morton, Inc. v. Norcal Electronics, Inc. (In re Kannry & Morton, Inc.)*, 91 B.R. 93, 94 (Bankr.N.D.Cal.1988). The breadth of § 547(b) includes the involuntary transfer of the walnuts to the Sheriff.

### E. The California Producer's Lien Law Conflicts With the Federal Preference Law

#### 1. Purposes of the California Producer's Lien Law and the Preference Law Under the Bankruptcy Code.

Certainly the drafters of the California producer's lien law anticipated that growers of farm product would invoke the law to obtain payment ahead of other creditors. That is the purpose of this statutory scheme, providing "financial protection for farmers by making them secured creditors of the farm-product processing companies." Dale Bratton, *The California Agricultural Producer's Lien, Processing Company Insolvencies, and Federal Bankruptcy Law: An Evaluation and Alternative Methods of Protecting Farmers*, 36 HASTINGS L.J. 609, 615 (March 1985). It is unlikely, however, that the California legislature envisioned a situation such as the one presented to this Court, where, just prior to the filing of a bankruptcy case, one grower seeks to use the statute to obtain a lien more senior than that held by other growers.

■ The drafters of the Bankruptcy Code were concerned about this systemic problem. During the 90 days before a bankruptcy is filed, a debtor's situation becomes increasingly unstable. As creditors become aware of the debtor's financial debilitation, they may apply additional pressure during the collection process in an attempt to obtain payment on their debt to the extent possible. This may require cash on delivery, an advance deposit, a payoff of old debt before new credit is extended, or commencing a law-

suit to collect overdue accounts receivable. To avoid a situation where the debtor has been irreparably drained of funds before the bankruptcy case has even begun, § 547(b) was enacted. This section gives the trustee the right to undo, in certain circumstances, transfers that were made during the 90 days prior to the bankruptcy filing. It is a broad grant of authority, allowing avoidance of transfers of interests of the debtor in property if five conditions are satisfied and unless an exception applies. *Union Bank v. Wolas,* 502 U.S. 151, 154, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). As the Supreme Court discussed in *Union Bank,* the preference statute "is intended to serve two basic policies." Those policies are discouraging a pre-bankruptcy race to the courthouse by creditors and facilitating equality of distribution among creditors. *See id.* at 160–161, 112 S.Ct. 527. *See also Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214, 1217 (9th Cir.) (citation omitted), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Mandross v. Peoples Banking Co. (In re Hartley),* 825 F.2d 1067, 1069 (6th Cir.1987); *Yellowhouse Machinery Co. v. Mack (In re Hughes),* 704 F.2d 820, 822 (5th Cir.1983) ("[t]he nature of the preference avoiding powers ... is intended to promote the common good of all of an estate's creditors").

### 2. The Filing of an Avoidance Action Is Not Required.

■ The Trustee has acknowledged that he will not bring an avoidance action against Boeger because the walnuts have already been turned over to the estate pursuant to a motion granted during the first few days of this case. Simply because an action cannot or will not be brought, however, does not negate the preferential nature of the transfer. For example, under 11 U.S.C. § 502(d), a bankruptcy court must disallow the claim of any entity that is a transferee of a preferential transfer. The fact that no action to avoid the transfer has been commenced is immaterial; in fact, the claim may be disallowed even if the statute of limitations has run on actions to avoid preferential transfers. *See Committee of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.),* 143 B.R. 734, 737 (9th Cir. BAP 1992) ("If [a preference] action is time-barred, an objection [to claim] ... should be pursued. In this manner, the Code achieves the most equal distribution available and remains consistent with ancient common law doctrine concerning the defensive use of time-barred claims."); *In re Stoecker,* 143 B.R. 118, 130–133 (Bankr. N.D.Ill.), *rev'd in part on other grounds sub nom. Bank of Bellwood v. Stoecker,* 143 B.R. 879 (N.D.Ill.1992) and *Matter of Stoecker,* 5 F.3d 1022 (7th Cir.1993). This is because a trustee is not affirmatively seeking to avoid the transfer, but is using the preference section defensively.

### 3. Equality of Treatment Under the Bankruptcy Code.

■ The Bankruptcy Code aims to insure that all creditors in the same class are treated equally. Transfers that enable recipients to receive more than they otherwise would have and that satisfy the other requirements of § 547(b) are avoided. Since the walnuts have been returned, one could argue that the transfer did not put Boeger in a better position than the other unsubordinated growers. But if the transfer caused the other growers to lose their liens, there is no question but that it had the effect of putting Boeger in a better position. *See, e.g., Nixon v. Davis Water and Waste Industries, Inc. (In re D.R. Goris Plumbing, Inc.),* 49 B.R. 146, 148 (Bankr.M.D.Fla.1985) ("[A] transfer to a creditor holding a valid ... statutory lien on any property of the estate seldom, if ever, could be a voidable preference *unless there are other creditors in the same legal class, in addition to the secured creditor who received the preference.*") (emphasis added). It would be inconsistent with the goals of the Bankruptcy Code for Boeger to attain a position ahead

of the other unsubordinated growers as a result of its race to the courthouse.

If Boeger argues that the levy did not transfer an interest of the debtor, then it is tacitly admitting that the debtor never lost possession of the walnuts. If the debtor did not lose possession, then the other growers' liens remain valid because those liens hinged on the debtor's possession of farm product. But if Boeger asserts that the debtor lost possession, as it must in order to argue that its lien is superior to those of the other growers, then it is admitting that the Sheriff's seizure was a transfer of an interest of the debtor in property, triggering the preference rules.

By filing its lawsuit and proceeding to judgment, Boeger was doing exactly what the drafters of the preference section intended to discourage. Boeger was taking advantage of the state law remedies available to it and racing to the courthouse for a piece of Churchill Nut's assets. Moreover, it was also pre-empting other growers and producers. While Boeger's action may be appropriate when assets are sufficient to satisfy all creditors, bankruptcy superimposes federal policy upon ordinary state law remedies.

## F. *The Policies Underlying Both Statutes Are Best Served By Denying Boeger's Motion.*

As the Supreme Court stated in *Union Bank v. Wolas,* the two policies underlying the preference statute "are not entirely independent," 502 U.S. at 161, 112 S.Ct. 527, and once a bankruptcy is commenced, neither are the policies underlying the preference statute and the producer's lien law. In the instant case, both statutes are served by denying Boeger's motion. By so doing, the Court declines to allow a race to the courthouse within 90 days of the bankruptcy filing to result in a better position for the creditor who won that race. Furthermore, it insures that creditors who were equally positioned prior to the transfer share *pari passu* in the distribution

under the Bankruptcy Code. Finally, all "laborers and suppliers who ha[d] increased the estate's value or, indeed, ha[d] created it" will be paid to the fullest extent possible. *Loretto Winery,* 898 F.2d at 721.

 The Trustee need not show that each element of § 547(b) has been satisfied in order to defeat a motion for summary judgment. Even though "[t]he fact that a creditor's action is voidable as a preference does not render that action void or otherwise invalid prior to a court's determination that the transfer is in fact avoided," *In re Union Meeting Partners,* 160 B.R. 757, 766 (Bankr.E.D.Pa.1993), the Court is not deciding today that the transfer is void or invalid. The Court is merely deciding that Boeger cannot prevail on a motion for summary judgment when the basis for its argument is a potentially voidable transfer.

## G. *The Del Riccio Decision of the California Court of Appeals is Inapplicable*

 Even if the levy had not triggered the preferential transfer section, Boeger would still have to answer the question of whether *Del Riccio's* holding applies in the instant case—that the execution of the writ resulted in a transfer of possession from Churchill Nut to Boeger. However, *Del Riccio* is distinguishable from the instant case. In *Del Riccio,* the sheriff levied on a bank account, obtaining the funds. The writ had been fully executed and the only duty that remained for the sheriff to complete was to turn over the money to the judgment creditor. In the instant case, it was not money that had been collected but a farm product. While the walnuts may have been fungible for the purposes of the producer's lien, they could not simply be turned over to the judgment creditor like cash. The Sheriff was required to conduct a sale in order to liquidate the walnuts. Had the walnuts been liquidated with only the turnover of the proceeds to Boeger remaining, then perhaps *Del Riccio* would be applicable. Noting that the Supreme Court had left open the question of wheth-

er property becomes property of the estate if a prepetition seizure operates to transfer ownership of the property, the Ninth Circuit distinguished between tangible property and cash. *"Whiting Pools* involved the seizure of tangible property. Post–*Whiting Pools* cases involving levies on bank accounts and accounts receivable have differed on whether a prepetition levy operated to transfer ownership and to keep the account from being property of the estate." *Dewhirst v. Citibank (In re Contractors Equipment Supply Co.),* 861 F.2d 241, 244 n. 6 (9th Cir.1988) (citing *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)).

■ Here, the Court will follow the guidance of the Ninth Circuit on the distinction between tangible property and cash, and will limit *Del Riccio* to its express language—only "money collected" under a writ and held by the sheriff is property of the judgment creditor. Goods of uncertain value that must be liquidated in a sale, such as walnuts, remain constructively in the judgment debtor's possession, even while held by the sheriff pending a sale. While the Sheriff's levy may have physically removed the walnuts from Churchill Nut's possession, it did not remove them from the reach of the producer's lien held by the other unsubordinated growers.

This holding is reinforced by the turnover order entered at the beginning of the bankruptcy case. On February 3, 1999, this Court ordered the Sheriff to turn over the walnuts pursuant to 11 U.S.C. § 543(b)(1): "A custodian shall (1) deliver to the trustee any property of the debtor held by or transferred to such custodian ... that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case." As a result of that order, the walnuts were returned to Churchill Nut and subsequently liquidated by the Trustee. The Sheriff never had the opportunity to complete the scheduled sale and the other unsubordinated growers never lost their producer's liens.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Boeger's motion for summary judgment is denied.